**The Reverend Gerald P. FOGARTY, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 54–82T.**

United States Claims Court.

Nov. 19, 1984.

Thomas Arden Roha, Washington, D.C., for plaintiff. Williams, Meyers & Quiggle, Washington, D.C., of counsel.

Allan C. Lewis, Washington, D.C., with whom was Asst. Atty. Gen. Glenn L. Archer, Jr., Washington, D.C., for defendant.

### ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

### OPINION

WIESE, Judge:

The Society of Jesus is a Roman Catholic religious order, also known as the "Jesuits" (herein referred to as the "Society" or "Order"), whose income has been granted exemption from taxation under the pertinent provisions of the Internal Revenue Code. Plaintiff is a member of this Society. He is a Roman Catholic priest bound to his Order (the Maryland Province of the Society of Jesus) by vows of chastity, poverty, and obedience. The question before the court is whether the income generated through plaintiff's acceptance of a teaching assignment with the University of Virginia Department of Religious Studies (the University) was taxable to him in his individual capacity or was instead the tax-exempt income of his Order as a principal. The case has been briefed and argued on cross-motions for summary judgment. At the conclusion of the oral argument the court ruled in the Government's favor. In this opinion we restate the bases for that ruling.

### FACTS

Teaching is an essential and traditional religious mission of the Society of Jesus. Since its founding in the early 1500's, the Society has been publicly committed to education, and to higher education in particular. In keeping with this purpose, in the spring of 1975, Reverend Fogarty was directed by his religious superior to pursue an invitation that had been extended to him to interview for a teaching position at the University of Virginia Department of Religious Studies. The interview led to an offer for an associate professorship, and upon instruction from his superior and in conformance with his vow of obedience, Reverend Fogarty accepted this position.

The letter inviting plaintiff to join the faculty of the University specified that his duties and responsibilities would be determined by the head of the Department of Religious Studies. That person, in turn, understood that as a Jesuit, Reverend Fogarty's retention of his teaching position, no less than his acceptance of it, was subject to the dictates of his religious superior and, in the last analysis, to conformance with the Society's teaching mission. These constraints notwithstanding, plaintiff's teaching position at the University involved no agreement between the University and his Order.

In his role as professor, plaintiff taught courses on Catholic religious thought, development, and history. He received a monthly salary from the University in the form of a payroll check made payable to him individually. Pursuant to his instruction, these checks were deposited in a checking account in the name of the Corporation of Roman Catholic Clergymen. This account was maintained at a local bank; signature authority for the account was maintained by plaintiff and the provincial treasurer as agents of the corporation. The amounts so deposited were not plaintiff's to keep, for under the canon law of the Roman Catholic Church and pursuant to his vow of poverty, he had no right to receive, direct the use of, or dispose of the monies received from the University for his own benefit. During the two-year period of his affiliation with the University, his entire salary went to his Order. The Order, in turn, provided him with living expenses.

In addition to the payment of a salary, plaintiff's teaching position at the University permitted his participation in certain employee benefit plans such as health insurance and retirement. He elected these coverages upon the direction of his religious superior.

At the end of 1977 and 1978, the University issued plaintiff a Form W–2, Wage and Tax Statement. This statement showed, *inter alia,* that the Commonwealth of Virginia—University of Virginia, as employer, had paid plaintiff, as its employee, annual wages in the respective amounts of $18,-122.20 and $18,683.31. There had been no withholding from these amounts either for social security taxes or for federal income taxes.

Plaintiff did not file an income tax return for 1977 or 1978 because he believed the amounts paid by the University to be the tax-exempt income of his Order (realized through his services as its agent) and not his personal income. Subsequently, upon audit of plaintiff's tax status, the examining agent concluded that plaintiff was obliged to report the income as his own,

and accordingly determined a federal income tax liability of $317 for the year 1977 and $1,562 for the year 1978. The amounts claimed due were paid. Timely claims for refund were filed but were denied. Suit was then commenced in this court.

## DISCUSSION

### A.

█ It is a basic tenet of the law of Federal income taxation that income is taxable to the person who earns it, *Commissioner v. Culbertson,* 337 U.S. 733, 739–40, 69 S.Ct. 1210, 1212–13, 93 L.Ed. 1659 (1949), and liability may not be avoided by an anticipatory assignment of that income. *Lucas v. Earl,* 281 U.S. 111, 114–15, 50 S.Ct. 241, 74 L.Ed. 731 (1930); *United States v. Basye,* 410 U.S. 441, 449, 93 S.Ct. 1080, 1085, 35 L.Ed.2d 412 (1973). Upon this principle both sides have staked their case.

To state plaintiff's position first, it is that by virtue of the vows that bound him to his Order, independence of action was not his right. Decisions affecting the apostolic mission were not his to make, income realized in that endeavor not his to keep. In short, plaintiff contends that he was no more than a spokesman for his Order; thus his dealings with the University of Virginia were those of an agent acting in behalf of a principal. Accordingly, the income generated from his labor was the income of the Order that authorized his teaching assignment in furtherance of its religious mission.

The Government answers this argument by saying, first of all, that regardless of how one may choose to characterize plaintiff's relationship with his Order—whether one of agency or not—the only point that matters here is that that relationship placed plaintiff under no legal disability to contract in his own right with third parties. And so the important question—continues the Government—is not whether plaintiff thought of himself as an agent or even whether his Order also shared that view. Rather, it is whether the University held

that view; did it, in fact, contract with plaintiff acting as an agent for the Order or was the University's agreement with plaintiff alone?

The argument the Government presents adopts the position taken in a number of revenue rulings dealing with this same subject. That position is that "an agency relationship is established when it appears, based on all the facts and circumstances, that the payer of the income [here the University] is looking directly to the order, rather than to the individual member, for the performance of services." Rev.Rul. 132, 1979–1 C.B. 62, 63 (remuneration received by Army chaplain subject to a vow of poverty is includible in his gross income). See also Rev.Rul. 84–13, 1984–4 I.R.B. 5 (compensation received by psychologist from private practice is taxable income notwithstanding that he is also a member of a religious order subject to vows of poverty and obedience); Rev.Rul. 267, 1981–2 C.B. 196 (pay received from a hospital by a member of a religious order who has taken a vow of poverty and obedience constitutes wages for purposes of social security tax withholding, since hospital looked to the member and not to the order for the performance of services); Rev.Rul. 290, 1977–2 C.B. 26 (compensation received by member of an order, who has taken a vow of poverty, for services performed in the business office of the supervising church is not includible in gross income when remitted to the order because the member is performing as an agent of the supervising church).

Along the same lines, the Government also contends that the present situation is analogous to those cases in which personal services are rendered to a third party by an individual who claims to be acting as a "loaned out" employee of a corporation, thereby presumably making the payments received for those services the income of the corporation and not the individual. In such cases, the analytical focus is much the same as in the case of the cited revenue rulings. That is to say, assuming first of all substantiation of the claimed employer-employee relationship (the parallel here to the claimed agency relationship), then the critical question becomes whether the employer-corporation's position of control over the loaned out employee is, in fact, acknowledged by the third party.

As a case in point, the Government cites the recent decision in Johnson v. United States, 698 F.2d 372 (9th Cir.1982). The taxpayer in that case was a professional athlete who had conveyed the exclusive right to his services to a corporation for a term of years in exchange for monthly payments for life. Following the making of this arrangement, he then negotiated and executed successive contracts with two National Basketball Association teams (the Golden State Warriors and the Washington Bullets) neither of which included his employer-corporation as a party. Johnson assigned his contract with the Warriors to his employer-corporation and the Warriors then paid his salary directly to his employer-corporation; in the case of the Bullets contract, that organization agreed to pay Johnson's salary to the employer-corporation but its undertaking to do so expressly referred to its contract with Johnson as a contract between Player and Club.

The court of appeals, in affirming that Johnson and not his employer-corporation was taxable on the amounts earned for his services, explained that cases involving payment for the personal services of an individual who is purportedly acting as a "loaned out" employee of a corporation present two basic questions: "(1) whether the [employer] corporation has the right to control the activities of the individual and the amount of compensation the individual receives for those activities; and (2) whether this control has been recognized and accepted by the contracting party." 698 F.2d at 374. In Johnson's situation, this two-fold test was not satisfied. The "crucial fact," held the court, "is that neither the Warriors nor the Bullets had contracted with Interlit [the employer-corporation]. They had contracted directly with appellant for his services * * *." Id. In short, the employer-corporation's control had been

neither recognized nor accepted by the contracting party.

### B.

■ The argument the Government has presented is controlling here. It can be no other way, for if the income generated from plaintiff's employment is to be treated as that of the Order, it must first be established that the contract under which the income was earned was that of the Order. Inescapably then, the question comes down to determining with whom the third party contracted, for in the answer to that inquiry lies the economic essence of the transaction and hence its character for income allocation purposes. Simply put, the question is to whom did the third party look for the accomplishment of the services it bargained for—to the plaintiff or to his Order?

On the facts of this case there can only be one answer to that inquiry. The University extended its invitation for interview to plaintiff, not to his Order. The University concluded its employment agreement with plaintiff, not with his Order. The University paid wages for the services received to plaintiff, not to his Order. And finally, it was the University that exercised administrative control over plaintiff's duties as a professor, not his Order.

Given these considerations, there is no case here for saying that the University dealt with plaintiff as a representative acting in behalf of his Society. The few relevant facts are consistent with only one view: that plaintiff was asked to speak for himself and did so. Nothing in the facts would permit the court to say that either side demonstrated an intention to include the Maryland Province of the Society of Jesus as a party to the contract, much less that such a purpose had, in fact, been accomplished.

That the University may have been aware of the self-limitations that plaintiff's vows prescribed adds nothing to the case. This is so, for even accepting plaintiff's premise that he could not act other than as an agent, given the power he had yielded to

his Order, it would still be the case that recognition of that status would depend upon its acceptance by the third party. Consequently, "[i]f it is agreed that the other party contracts solely with the agent, the principal does not become a party to the transaction * * *." Restatement (Second) of Agency § 147 Comment b (1958). Such is the fact in this case.

Plaintiff points to a number of revenue rulings whose results are said to affirm his position, that is, that the existence of an agency relationship necessarily defines the earning source of the income. Or, to say it as plaintiff has, "[i]t is the agency relationship between the religious order and its members which governs the incidence of taxation."

■ Granted, an agent is not taxed on the income he receives in behalf of his principal, *Maryland Casualty Co. v. United States*, 251 U.S. 342, 347, 40 S.Ct. 155, 157, 64 L.Ed. 297 (1920); nevertheless the revenue rulings plaintiff cites do not aid his case. Those rulings—the particulars of which we leave to an appendix—concern situations in which the principal involved can readily be seen as retaining a controlling presence in the transaction at issue, either as the entity with whom the third party deals or as an overseer of the transaction's important details. They therefore do not involve—as this case does—a contract between purported agent and third party that excludes recognition of the principal both in name as well as in the principal's right to exercise control over the manner of performance.

### CONCLUSION

The University contracted with plaintiff and not his Order. Accordingly, it follows that he is taxable on the income generated by his services. The court therefore grants the Government's motion for summary judgment, denies plaintiff's motion for summary judgment and directs that the complaint be dismissed.

APPENDIX

As pointed out in the opinion's text, plaintiff has referred the court to a number of revenue rulings which are said to confirm his contention that the existence of an agency relationship is, without more, the dispositive concern in deciding whether income is to be attributed to a principal. The rulings relied upon do not support such a proposition. While they do not express their conclusions in the same analytical framework as the court's opinion, nevertheless, it is clear that those rulings stand in full harmony with the court's views: income is to be taxed to a principal, and not an agent, where the form of the transaction reserves to the principal and not the third party a right of control over the incidents of performance. In view of plaintiff's extensive reliance upon these rulings both in his briefs and at oral argument, we assemble them here.

In Rev.Rul. 479, 1976–2 C.B. 20, members of a hospital's medical staff had formed a non-profit research and educational foundation to which were referred all hospital patients with limited incomes. All members of the hospital's staff, most of whom were private physicians, were obligated to be members of the foundation; additionally, each was required to execute an assignment form that enabled the foundation to collect all fees generated from their services to the foundation's patients. It was held that the physicians were not taxable on these assigned fees because their membership in the foundation was a condition precedent to their membership on the hospital's medical staff and because, as individuals, they exercised no control over the fees charged for their services or of the collection and disbursement of such fees. In short, the physician-members acted as agents only, the value of their services being determined solely by the hospital as the sponsoring principal.

The same is true of the situation presented in Rev.Rul. 282, 1965–2 C.B. 21. There it was held that statutory legal fees received by attorneys for representing indigent defendants were not includible in gross income because the attorneys performed their services as full-time, salaried employees of a legal aid society who were obliged, by the terms of their employment, to turn the fees received over to the society. The conclusion, holding that "the attorneys are considered to be receiving the fees as agents for the legal aid society", *id.*, recognizes the fact that, in the performance of their duties, the attorneys remained bound to the supervisory control of the employer-society and not to the court that appointed them.

That too is the explanation for the result reached in Rev.Rul. 581, 1974–2 C.B. 25, which dealt with the essentially comparable situation of statutory fees received by a faculty member or a student of the school of law in payment for legal services performed for indigent clients pursuant to court appointments, channeled through the school's several clinical programs. The law professors, being full-time salaried employees of the university whose duties included participation in the clinical programs, were obliged by the terms of their employment contract to turn the fees over to the university. The holding that these fees were income to the university and not income of the immediate recipients is consistent with the fact that the appointments were carried out through the school's clinical programs and involved services performed under the supervisory umbrella of those programs.

Still another ruling upon which plaintiff has relied is Rev.Rul. 152, 1956–1 C.B. 56. In this ruling, it was concluded that the broker-members of an insurance advisory council (a volunteer civic group) were not required to report as income the brokerage commissions earned through insurance purchases made by a municipal board of education on the basis of the council's recommendations. Exclusion from income turned on the fact that the broker-members had been designated to receive the brokerage commissions in their capacity as council mem-

bers and were obliged, under the terms of their appointment to that body, to apply any commissions arising out of their insurance recommendations to a special fund to be used for public purposes. To put this tax result in terms of the present case, it is that the agency relationship was controlling precisely because the third party (the department of education) had dealt with the council as a collective body and with its broker-members in their capacity as agents of the council.

Finally, plaintiff relies upon the result reached in Rev.Rul. 515, 1958–2 C.B. 28. The question involved there was whether a police officer was taxable on the income which he received for the work performed in his "undercover" police assignment in private industry. The officer remained on the public payroll during the period of his undercover work; the income he received from this outside source was turned over to a police pension fund in accordance with department regulations. It was held that the officer was not taxable on the income paid to him by the private sector employer because, in that undercover assignment, he was functioning as an agent of the police department.

Clearly the result reached in this ruling does not comport with the "recognition of control" test identified in the court's opinion. The result, however, should be understood for what it is: an exception to the traditional analysis based on grounds of public policy. From a public policy standpoint it would make no sense whatever to treat the police officer's undercover income as his own because the principal had been excluded from the transaction. The object of the police officer's assignment in the first instance was to hide his true identity—and thus too his principal's (the police department)—from the third party. In short, the result reached in this ruling should be read in light of the unique circumstances involved; no rule of general application was intended.