FRANCINE SCHUSTER, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 20396–82.     Filed April 29, 1985.

*William J. Falk* and *Mary Gassmann Reichert,* for the petitioner.

*Frank Agostino* and *David R. Reed,* for the respondent.

WILBUR, *Judge*: Respondent determined a deficiency in petitioner's 1980 Federal income tax in the amount of $1,529. The sole issue for decision is whether compensation earned by petitioner while she was a member of a religious order is includable in her gross income.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference.

Petitioner resided in Red Bud, Illinois, when she filed her petition in this case. She timely filed her 1980 Federal income tax return with the Kansas City Service Center.

During all relevant times, petitioner was a member, or Sister, in a religious order of the Roman Catholic Church called the Order of the Adorers of the Blood of Christ (the Order). The Order was incorporated under the laws of the State of Illinois on July 24, 1886, as the Convent of the Sisters of the Precious Blood, and is a religious organization exempt from Federal income tax. The Order's corporate objective is stated to be "to conduct schools and places of learning and to promote education, to advance the cause of religious and social work, to conduct hospitals and institutions for the care and treatment of suffering humanity and to do all and everything necessary or convenient for the accomplishment of any of the purposes or objects and powers mentioned or incidental thereto."

Each member of the Order is required to make vows of chastity, obedience, and poverty as a precondition of membership. Petitioner therefore executed a "Declaration Concerning Remuneration" in which she agreed "never [to] claim or demand, directly or indirectly, any wages, compensation, remuneration, or reward * * * for the time or for the services or work that I devote for * * * [the Order] during the time I

may remain there or elsewhere in the name of or upon commission from said [Order]."

A member who wishes to withdraw from the Order may receive official dispensation from her vows by application through her provincial superior to the general superior of the Order. In addition, some members have withdrawn from the Order without obtaining dispensation from the Church. Members who withdraw from the Order are entitled to receive the personal property they owned before joining the Order, as well as property received by gift or inheritance. In addition, withdrawing members are entitled to the return of their dowries, if they had them. The procedures set forth in the Order's constitution for the return of property to withdrawing members do not vary for members who fail to obtain official dispensation from their vows.

Members of the Order are allowed to secure employment (called missions) in occupations that relate to the Order's general purposes, subject to approval by a Provincial Superior of the Order. The Provincial Superior's approval turns upon whether the proposed mission is in accordance with the Order's interpretation of the Gospel of Jesus Christ; that is, whether the mission relates to religious and charitable works that promote education, relieve suffering, and otherwise provide assistance to those in need.

When a member takes a vow of obedience as a precondition to her membership in the Order, she expressly promises to subjugate her will to that of the Order. Pursuant to that vow, no member may accept a mission without the approval of the Order. Each member who receives a missioning order is under a duty to obey that order and cannot voluntarily terminate the mission without the Order's prior approval. In addition, each member promises to abide by any direction of the Provincial Superior, even if such direction relates to the performance of the mission itself, or requires the member's withdrawal from the mission. The Order has at times required members to terminate their assigned missions.

Pursuant to their vows, members of the Order are not entitled to retain any funds generated by their mission work; rather, the Order is entitled to all such funds. Thus, the Order requires its members to submit any payments made to a member in respect of a mission. After the member transfers

the funds to the Mother House, the member maintains no control over the Order's disposition of the funds. If a member who has engaged in mission work subsequently leaves the Order, the constitution of the Order provides that "A sister who withdraws may not demand remuneration for her work as a member of the community, since, like all the Adorers of the Blood of Christ, she freely chose to serve the Lord and His people in a life of poverty, without personal gain. The community, however, in charity will help her provide for her immediate needs when she leaves."

When a member of the Order is missioned in a location that is not impracticably far away from the Mother House of the Order, the member generally lives in the convent. When, on the other hand, a mission is not located near a convent, the Order rents a residence for the member. Any house rented by the Order for these purposes is considered within the Order to constitute a convent. Each member living away from the Mother House of the Order is required to submit to the Order a monthly budget statement setting forth her living expenses. The Order then either approves or revises the proposed budget, and pays the member's monthly living expenses, as approved. In addition, the Order provides its members with a maximum allowance for personal expenses which, during the year at issue, was $35 per month. There is no relationship between the amount of a member's monthly allowance and the amount of funds, if any, generated by her mission work.

Petitioner made her perpetual vows of poverty, chastity, and obedience in 1970 and became a perpetual member of the Order at that time. She has never requested dispensation from her vows, and at all relevant times was an active member of the Order.

In June, 1968, petitioner received her bachelor of science degree in nursing. On October 18, 1978, petitioner was awarded a traineeship for Nurse Practitioner training under section 882(b) of the Public Health Services Act. This award covered the cost of petitioner's tuition, living and moving expenses, books and fees in the nurse midwife program at the University of Mississippi's medical center. In order to receive the traineeship award, petitioner agreed that upon completion of her traineeship she would reside and practice in a "health manpower shortage area" (as defined by section 332 of the Public

Health Services Act) for a 12-month period for each academic year for which the traineeship award was made. Petitioner agreed that if she failed to fulfill her "practice commitment" she would "pay back within 12 months of the date of completing the training, the amount of all traineeship assistance received, plus interest set by the Treasury."

From February 28, 1978, through May 12, 1979, petitioner attended the University of Mississippi's nurse midwife program. Upon her graduation in May 1979, petitioner applied and was interviewed for several positions in health manpower shortage areas. Prior to being interviewed for these positions, petitioner sought and obtained authority from the Order to do so. One position petitioner applied for was a position with Su Clinica Familiar (the clinic). The clinic conducts a family health services program in Raymondville, Texas.

During the year in issue, a portion of the clinic's staff was employed through the National Health Services Corps (NHSC). The NHSC is a Federal program within the U.S. Public Health Service that assigns health professionals in its employ to deliver health care services in health manpower shortage areas. The NHSC provided the clinic with necessary professional staff, such as physicians, mid-level practitioners, and nurse-midwives. The professionals provided by the NHSC were employed and compensated by the Federal Government, and not by the clinic.

Although the details are not entirely clear, the record reveals that petitioner filed an application for employment with the NHSC in conjunction with her application to the clinic. Her application was made on a Federal Government Standard Form 171 on which she stated that she would not accept a salary of less than $16,000 per year. She applied for the job "in order to fulfill my 12-month commitment to practice as a Nurse Practitioner in a primary care health shortage area designated under Section 822(b) of the * * * [Public Health Services] Act." She stated on her application to the NHSC that she would accept a position only if she were assigned to work at the clinic in Raymondville, Texas. Subsequently, petitioner was interviewed over the telephone by an employee of the NHSC. Neither the NHSC nor the clinic is affiliated with petitioner's Order in any way.

The NHSC paid for petitioner to travel to the clinic in late May, 1979, "for the purpose of visiting the community as a prospective National Health Service Corps assignee." On June 27, the Clinic informed the NHSC of "the clinic's intention of employing Sister Francine Schuster as a staff nurse-midwife. She will begin on July 23, 1979."

After petitioner was informed that a position was available to her at the clinic, she requested permission from her Order to accept. Her Order determined that the position at the clinic would further the purposes of the Order by helping to relieve the suffering of humankind, and by promoting life, and thus informed petitioner that her mission was acceptable.

On July 1, 1979, the Acting Provincial Administrator of petitioner's Order addressed a letter to the director of the nurse-midwifery service at the clinic. That letter stated the following:

> Sister Francine Schuster [petitioner] had informed us of your recent phone notification of a current job opening in nurse midwifery at Su Clinica Familiar, Raymondville-Harlingen, Texas.
>
> The Community of Adorers of the Blood of Christ [the Order] would like to contract with you for the services of Sister Francine Schuster, ASC for the position of nurse-midwife for one year at Su Clinica Familiar.
>
> If our offer is acceptable, we request that payment for her services be made to the Adorers of the Blood of Christ.

Also on July 1, petitioner addressed a letter to the NHSC which "confirms that I have agreed to an NHSC assignment at * * * [the clinic]. My starting date will be 7/29/79." In addition, the Acting Provincial Administrator of petitioner's Order addressed a letter to the NHSC in which she stated the following:

> Sister Francine Schuster has informed us of your recent phone notification of a current job opening in nurse midwifery at Su Clinica Familiar, Raymondville - Harlingen, Texas.
>
> The Community of Adorers of the Blood of Christ would like to contract with you for the services of Sister Francine Schuster, ASC for the position of nurse-midwife for one year at Su Clinica Familiar.
>
> If our offer is acceptable, we request that payment for her services be made to the Adorers of the Blood of Christ.

In addition, the Order informed the NHSC that:

petitioner is a member in good standing of [the Order] * * * and is, therefore * * * under a vow of poverty; * * * her services are performed as part of the duties required to be performed by the member for/or on behalf of the order as its agent; and that all salaries or grants received by her accrue to the * * * [Order] because of her vow of poverty.

In response to the letter that the Order addressed to the clinic, the director of the nurse-midwifery service at the clinic sent a letter dated July 9, 1979, to the Acting Provincial Administrator of the Order which provided as follows:

Consider this letter as formal acceptance of Sister Francine Schuster on our nurse-midwifery staff. She will be beginning on the pay period that starts July 23. Sister Francine's checks will be paid to her and she can endorse them and send them to you. I endorse my checks "paid to the order of the Sisters of St. Mary. Sister Angela Murdaugh." There is no problem with them going through the mail like that.

The record contains no evidence that the NHSC ever responded to the Order's letter. Contrary to the Order's request, petitioner's paychecks were issued only in her name.

Petitioner began to work at the clinic on July 25, 1979, even though her NHSC appointment was not effective until July 29. As a result, the clinic paid petitioner for July 25, 26, and 27, and terminated payments effective July 27.

Petitioner's appointment by the NHSC was effective as of July 29, 1979. She was employed at the GS-9 level as an "excepted appointment" pursuant to normal Federal Government personnel policies. As a GS-9 employee, her salary was $15,920 per year. She accumulated annual leave and sick leave, and she qualified for Federal Health benefits. During the course of her appointment, petitioner received a within-grade increase in salary, and a salary increase for Federal employees made pursuant to Executive order. While employed by the NHSC, petitioner was entitled to, and received, continuing professional education classes paid for by the Federal Government.

On the effective date of her NHSC employment, petitioner signed a standard Government Form 61, on which she swore to support and defend the U.S. Constitution, and promised that she would not participate in any strike against the U.S. Government while employed by it or "any agency thereof."

As a member of the NHSC, petitioner was a civil service employee subject to the Department of Health, Education, and

Welfare standards of conduct. NHSC assignees are evaluated on a yearly basis through an employee performance appraisal system. Petitioner's performance as a midwife was evaluated on forms provided by the Federal Government.

The clinic and NHSC signed an agreement effective February 15, 1980, which provided that:

The Assignee(s) [petitioner] shall remain at all times under the direct supervision and control of the DHEW [Department of Health, Education & Welfare] Regional Health Administrator or his designee. Observance of institutional rules and regulations by Assignee(s) are mere incidents of the performance of their Federal functions and do not alter their direct professional responsibility to the Secretary. * * * Day to day administrative direction will be given by the Project Director [an employee of the clinic].

The clinic, NHSC, and petitioner operated in accordance with this agreement.

The NHSC, pursuant to section 224 of the Public Service Health Act (42 U.S.C. sec. 223) provides all assignees with defense against all malpractice suits resulting from injuries occurring during the course of the assignee's employment.

While employed by the NHSC, petitioner was paid from the U.S. Treasury. Petitioner's wages were paid directly to her. Neither the clinic nor the NHSC imposed any restriction on petitioner's use of payroll checks. Petitioner endorsed to her Order each check tendered to her, and she sent each check to a lockbox maintained by the Order in St. Louis.

The Order did not provide the NHSC or the clinic with a replacement when petitioner used sick leave.

Petitioner terminated her association with the clinic in 1982, when the Federal funding for her position was terminated. Upon her separation from NHSC, petitioner was paid for 128 hours of accrued annual leave.

On petitioner's 1980 Federal income tax return, petitioner reported that she had received $18,771.20 in wages, but that the compensation was not subject to taxation "by reason of taxpayer being agent of religious order pursuant to Rev. Rul. 77–290." Respondent issued a notice of deficiency in which he determined that petitioner's wages were taxable because she was not working as an agent of a religious order when she earned her wages.

OPINION

At issue is whether petitioner's wages were paid to her in her individual capacity or as an agent for the Order. If the wages were paid to satisfy an obligation to pay petitioner individually, they are subject to taxation regardless of their ultimate transferral to the Order. E.g. *Lucas v. Earl*, 281 U.S. 111 (1930). If, on the other hand, the checks were delivered to petitioner in order to satisfy a debt owed to the Order, then petitioner received the checks as a mere agent of her Order, and is not subject to taxation individually. *Maryland Casualty Co. v. United States*, 251 U.S. 342 (1920).

Petitioner applied for employment as a Federal civil servant, and accepted a job as a National Health Service Corps employee. The NHSC assigned her to work at Su Clinica Familiar. Neither the NHSC nor the clinic is affiliated with or related to petitioner's Order in any way.

Petitioner filed a Standard Form 171 with the Federal Government on which she stated that she would not accept a salary of less than $16,000 per year. She stated that she had applied for the job "in order to fulfill my 12-month commitment to practice as a Nurse Practitioner in a primary care health shortage area" pursuant to Federal law, in exchange for having received Federal assistance to pay for her nursing education.

Petitioner was employed by the Federal agency pursuant to normal personnel policies. She accumulated annual leave and sick leave, and she qualified for Federal health benefits. She received all the benefits of a Federal employee employed at the GS-9 level, including a within-grade increase in salary, and a salary increase for Federal employees made pursuant to Executive order.

Petitioner received paychecks in her own name, and, pursuant to her private vows with the Church, endorsed her checks over to her Order. She personally handled all aspects of her relationship with the clinic and with the Federal Government; indeed, the only contact that those two institutions appear to have had with her Order occurred when the Order sent them letters stating that the Order wished to contract with them for petitioner's services, and that it would like her wages to be issued payable directly to the Order. The Federal Government ignored the letter, and issued checks made payable to petition-

er. The clinic responded with a letter informing the Order that the checks would be made payable to petitioner, and that petitioner could endorse them over to the Order. These facts are clearly insufficient to support a finding that petitioner's paychecks were issued to satisfy an express or implied legal obligation to her Order, and we therefore hold for respondent.

The instant case is unlike many of the so-called "vow of poverty" cases decided recently by this Court[1] in that Sister Francine Schuster at all times acted strictly in accordance with her vows of poverty and obedience, and at no time after endorsing the checks did she exercise any sort of control over the funds. Petitioner is part of a long tradition that is respected in our society, and these private arrangements with her Order arise from deeply held convictions. The fact that we feel her life is a sincere and worthwhile example should not, however, alter the tax results. In the final analysis, apart from petitioner's vow of poverty arising from her personal religious convictions and way of life, this case is not different from any other assignment of income case.

The hornbook law on assignment of income was set out by Justice Holmes in *Lucas v. Earl*, 281 U.S. 111 (1930), when he stated:

But this case is not to be decided by attenuated subtleties. It turns on the import and reasonable construction of the taxing act. There is no doubt that the statute could tax salaries to those who earned them and provide that the tax could not be escaped by anticipatory arrangements and contracts however skillfully devised to prevent the salary when paid from vesting even for a second in the man who earned it. That seems to us the import of the statute before us and we think that no distinction can be taken according to the motives leading to the arrangement by which the fruits are attributed to a different tree from that on which they grew. [281 U.S. at 114–115.]

During the last half century since *Lucas v. Earl*, we have been advised repeatedly of the fundamental rule that income must be taxed to him who earns it; indeed, the Supreme Court has referred to the rule as "the first principle of income taxation." *Commissioner v. Culbertson*, 337 U.S. 733, 739 (1949); *United States v. Basye*, 410 U.S. 441 (1973). See Lyon &

---

[1] *E.g., McGahen v. Commissioner*, 76 T.C. 468 (1981), affd. without published opinion 720 F.2d 664 (3d Cir. 1983); *Ford v. Commissioner*, T.C. Memo. 1984–501; *Brennan v. Commissioner*, T.C. Memo. 1984–500; *Wert v. Commissioner* T.C. Memo. 1984–499.

Eustice, "Assignment of Income: Fruit and Tree as Irrigated by the P.G. Lake Case," 17 Tax L. Rev. 295 (1962).

Petitioner urges that this "first principle of taxation" does not apply because she received the paychecks merely as an agent of the Order, and cites to *Maryland Casualty Co. v. United States*, 251 U.S. 342 (1920). In that case, the Supreme Court held that paying insurance premiums to an insurance agent is equivalent to paying the insurance company directly, and that the insurance company must therefore take into its gross income those premiums held by its agents.

Petitioner asserts that her case falls within this rule because she agreed with her Order that she would act on its behalf and subject to its control, and because she subsequently remitted all the funds generated by her work to her Order. She states that "Only two parties are required to create the relationship."

What petitioner has failed to recognize is that, in the legal sense, one can perform services for a third party on someone's "behalf" only if some sort of obligation to perform the services rests initially with the person on whose behalf one wishes to act. If the "principal" is under no duty to perform the services itself, or to ensure that the services be performed, but merely approves of the performance as an irrelevant bystander, then, in the legal sense of the word, one cannot act on the other's "behalf." To this extent, the participation of three parties is required to create an agency relationship.

This analysis implicitly underlies the Supreme Court's decision in *Maryland Casualty Co. v. United States, supra*. In that case, the agent did not escape taxation because he was obliged to transmit the funds to his principal, nor did he escape taxation because his principal approved of his conduct. Rather, the Supreme Court reached its conclusion because "payment of the premium to the agent discharged the obligation of the insured and called into effect the obligation of the insurer as fully as payment to the treasurer of the claimant could have done." *Maryland Casualty Co. v. United States, supra* at 347. The premiums were the consideration for the risk underwritten by the insurance company, and payment to the agent was made to satisfy the obligation to pay the insurer. It was for this reason that the Court held that the principal, and not the agent, should be taxed.

Thus, the notion established in *Maryland Casualty Co.*, that an agent should not be taxed on amounts it receives as its principal's legal representative, depends upon the existence of some form of legal relationship between the principal and a third party. This Court and other courts have consistently required such a relationship. E.g. *Johnson v. United States*, 698 F.2d 372 (9th Cir. 1982); *Johnson v. Commissioner*, 78 T.C. 882, 891 (1982), affd. without published opinion 734 F.2d 20 (9th Cir. 1984); *Pacella v. Commissioner*, 78 T.C. 604, 619 (1982); *Keller v. Commissioner*, 77 T.C. 1014, 1027 (1981), affd. 723 F.2d 58 (10th Cir. 1983). In *Johnson v. Commissioner, supra* at 891, we stated that "there must exist between the corporation [the 'principal'] and the person or entity using the services a contract or similar indicium recognizing the corporation's controlling position."

The issue, then, is not whether the Order and petitioner agreed between themselves that petitioner would act as the Order's "agent." Rather, the issue is whether petitioner performed her services as an employee of the Federal Government, or whether the Federal Government contracted to receive the services from the Order, with petitioner performing the services as an agent of the Order. The facts in this case show that petitioner acted to affect only her own legal relationship with the Federal agency.[2] She expressly accepted the employment in order to satisfy her personal obligation to work in a health manpower shortage area. If her rights as a Federal employee had been violated, petitioner could have brought suit only in her individual capacity, and the Order could have become involved, if at all, only as an assignee of petitioner's contract rights.

---

[2]Indeed, the U.S. Claims Court recently reached the same conclusion in a very similar case. *Fogarty v. United States*, 6 Cl. Ct. 612 (1984), on appeal (Fed. Cir., Jan. 16, 1985). *Fogarty* involved a Roman Catholic priest who worked as an associate professor at the University of Virginia's Department of Religious Studies. The court found that teaching is an essential and traditional religious mission of the priest's religious order, that the priest had accepted the position upon instruction from his superior, and that he had acted strictly in accordance with his vow of poverty at all relevant times. The Claims Court nevertheless determined that the wages paid were taxable to the priest, stating as follows:

"if the income generated from plaintiff's employment is to be treated as that of the Order, it must first be established that the contract under which the income was earned was that of the Order. * * * Simply put, the question is to whom did the third party look for the accomplishment of the services it bargained for—to the plaintiff or to his Order?"

The court based its conclusion that the university looked directly to the priest for performance on facts indistinguishable from those involved in the instant case.

It was the Federal Government, and not the Order, who assumed responsibility for any malpractice liability petitioner might incur, and thus it seems clear that both parties assumed that the Federal Government as employer, rather than petitioner's Order, would have been held responsible under the doctrine of respondeat superior if petitioner had injured someone during the course of her employment. It was petitioner, and not the Order, whom the Federal Government advised that "the NHSC professional is required to place official responsibilities above any conflicting interests or associations. He/she must avoid conflicts of private interests with public duties and responsibilities," and petitioner was bound in her individual capacity by this requirement. If petitioner had violated her vows with the Church by retaining the checks for her personal use, her Order would have had no legal claim against the clinic or the Federal Government, and petitioner's relationship with her employers would have been unaffected.

In determining whether earnings from personal services are taxed to an individual or to an affiliated corporation, courts have examined two factors. First, as discussed above, courts have looked for some indicium of an agreement between the corporation and third parties. Second, they have required that the service-performer employee "be just that—an employee of the corporation whom the corporation has the right to direct or control in some meaningful sense." *Johnson v. Commissioner, supra* at 891; see *Vnuk v. Commissioner*, 621 F.2d 1318, 1320–1321 (8th Cir. 1980), affg. a Memorandum Opinion of this Court; *Vercio v. Commissioner*, 73 T.C. 1246–1255 (1980).

Although the entity here is a religious order, no different criteria should apply, and clearly the Order does not control the earning of the income as that term has been used in the decided cases.

Facing similar facts and an analogous legal issue, the U.S. Claims Court recently held that wages received by a Catholic nun as an employee of a county hospital were subject to the FICA tax. *Samson v. United States*, 4 Cl. Ct. 325 (1984), affd. 743 F.2d 884 (Fed. Cir. 1984). The plaintiff in that case argued that, as a member of a religious order who was subject to vows of poverty and obedience, she was "directed or required" by her superiors to perform services at the hospital in pursuit of the mission of her Order. This argument is analogous to petition-

er's argument in the instant case that her Order controlled the earning of the income. The following response by the Claims Court applies equally here:

> The plaintiff's argument is superficially appealing until it is realized that, from the standpoint of reality, the Order could not *require* or *direct* the plaintiff to perform the duties of the civil service position of Speech Therapist, job classification No. 1390, for the St. Louis County Department of Community Health and Medical Care. Actually, the Order did not have any authority or responsibility in connection with the selection of the person who was to fill and perform the duties of that position. Standing alone, a purported requirement or directive by the Order that the plaintiff take over and perform the duties of the civil service Speech Therapist position with the St. Louis County Department of Community Health and Medical Care would have been absolutely meaningless.
>
> The authority and responsibility with respect to determining who would fill and perform the duties of the Speech Therapist position were vested in an appointing official of the St. Louis County Department of Community Health and Medical Care, acting on the recommendations of other county officials and in accordance with the regulations of the St. Louis County Civil Service Commission. The extent of the Order's participation in the matter was merely to determine whether the plaintiff should apply and compete for the position and, later, to determine whether the plaintiff should accept the position when it was offered to her by the appointing official of the county, after her application had been considered and she had undergone successful interviews with county officials.
>
> In essence, the Order's role was to grant (or deny) authorizations to the plaintiff with respect to her desire to participate in the county's appointing process. The Order could not—and did not—issue any mandatory requirement or directive controlling the appointing process.
>
> [*Samson v. United States*, 4 Cl. Ct. at 329.]

It is one thing for a member of a religious order to work in the schools, hospitals, and other facilities of the Order. It is an entirely different matter for a member of that Order to enter the secular world as an employee of the Federal Government, or of a private corporation. In the former case, the individual deals with third parties (for example, students and patients) on behalf of the Order, as the Order's legal representative and subject to the Order's daily control over whether, and how, the services are performed. Third parties have chosen to form a relationship with the Order, and the individual represents the Order in the relationship. Whatever amounts are paid by these third parties are paid to satisfy a legal obligation to the Order. In the latter case, the Federal Government or corporation pays the individual in satisfaction of its legal obligation to her as an

employee. The Order is not involved at all, except as the recipient of petitioner's earnings when she endorses her check over to the Order.

We therefore conclude that petitioner earned the income at issue in her individual capacity, and is properly subject to taxation upon it. *Lucas v. Earl*, 281 U.S. 111 (1930).

*Decision will be entered for the respondent.*

Reviewed by the Court.

DAWSON, SIMPSON, STERRETT, CHABOT, PARKER, HAMBLEN, COHEN, CLAPP, JACOBS, and WRIGHT, *JJ.*, agree with the majority opinion.

GERBER, *J.*, did not paricipate in the consideration of this case.

---

KÖRNER, *J.*, I must respectfully dissent from the majority opinion in this case.

The majority seems to be overwhelmed by the fact that petitioner was carried on the rolls as a Federal Government employee, was paid by a Federal Government check, and had all the protections and benefits that other Federal employees get, e.g., paid sick leave and vacations, retirement benefits and the like, all of which the majority discusses in great detail. Under the apparent spell of these conceded facts, the majority then only feels it necessary to invoke *Lucas v. Earl*, 281 U.S. 111 (1930), and that is the end of the matter: respondent prevails.

Why this relationship to the Federal Government is so important to the majority in deciding the case escapes me. Presumably, petitioner would have had some or comparable benefits if she had been employed in private industry. Is the majority intimating that there would be a different result in such case? I do not see how this could be so. To me, it is entirely unimportant whether petitioner is to be considered an employee of the Federal Government or an employee of the clinic, which supervised and directed her day-to-day work and was the place where she was employed. It is not even in dispute in this case that petitioner worked for an employer

outside her own Order; both sides agree that it is so. The real question in the case is this: when compensation was paid to petitioner for her services at the clinic, did petitioner receive that paycheck under her own claim of right as a person who had independently contracted her services, or did petitioner receive such paycheck as the agent of the Order, under a preexisting and enforceable contract obligation to serve as such agent? In my opinion, the latter is the correct answer, and requires that the case be decided in favor of petitioner.

Section 61 provides the general rule that gross income includes all income, from whatever source derived, except as otherwise provided by law. Section 61(a)(1) specifically includes compensation for services within the definition of gross income. Moreover, it is a fundamental rule of Federal tax law that attempts by a taxpayer to shift the incidence of taxation, by anticipatorily assigning income earned in his individual capacity, will be ineffectual. See sec. 1.62–2(c), Income Tax Regs. This basic rule derives from *Lucas v. Earl*, *supra*, where the Supreme Court said:

There is no doubt that the statute could tax salaries to those who earned them and provide that the tax could not be escaped by anticipatory arrangements and contracts however skillfully devised to prevent the salary when paid from vesting even for a second in the man who earned it. That seems to us the import of the statute [sec. 61] before us * * * [281 U.S. at 114–115.]

The frequently referenced "first principle of income taxation: That income must be taxed to him who earns it," *Commissioner v. Culbertson*, 337 U.S. 733, 739–740 (1949), finds its genesis in the above quote from *Lucas v. Earl*, *supra*, and is the bedrock of the majority's position in this case.

However, almost from the announcement of the assignment of income doctrine in *Lucas v. Earl*, *supra*, the Supreme Court acknowledged that practical realities dictate against an overly simplistic application of the rule which would always allow identification of the taxable party merely by pointing to the individual whose efforts generated the payments in question. Recognition must be given to the fact that, because of various fiduciary, business, and other legal relationships and restrictions encountered in the real world, an individual's personal labors may generate income which, although passing through his hands, never in fact becomes property subject to his actual

control or disposition. Such recognition militates against carrying the "first principle of taxation" to a dryly logical extreme. Thus, in *Poe v. Seaborn*, 282 U.S. 101 (1930), decided only 8 months after *Lucas v. Earl, supra*, the Supreme Court held that the earnings of couples living in community property States must be reported one-half by each, irrespective of the fact that one spouse's personal efforts generated all of the income of the marital community. The Court reasoned that, in a community property State, the husband was the *agent* of the marital community, and "the earnings [of the husband] are never the property of the husband, but that of the [marital] community." *Poe v. Seaborn, supra* at 117.

For similar reasons, it has long been the rule that where an agent, within the scope of his agency, earns income on behalf of a separate and distinct principal and, in accordance with his fiduciary duty, turns such income over to his principal, it is the income of the principal and not the agent. *Maryland Casualty Co. v. United States*, 251 U.S. 342 (1920). This basic rule recognizes that, under the law of agency, an agent who labors within the scope of his agency, and thereby generates income, is, by law, duty-bound to transmit such income to the principal. 2 Restatement, Agency 2d, sec. 388 (1957) (hereinafter cited as "Restatement Agency"). The assignment of income doctrine of *Lucas v. Earl, supra*, simply has no application in such a case, since the agent never receives or contemplates receiving income which he is in a position to assign in his own right.[1]

The issue presented in this case—whether petitioner is taxable upon income paid with respect to her services as a midwife—therefore requires a determination of whether the income was earned by petitioner in her individual capacity, or in her capacity as an agent of the Order. If the income was earned by petitioner in her individual capacity, her transfer of such income to the Order will not relieve her of tax liability thereon. *Lucas v. Earl, supra*; sec. 1.61–2(c), Income Tax Regs. If, on the other hand, petitioner earned such income only in her capacity as agent for the Order, it is income to the Order and not to petitioner. Cf. *McGahen v. Commissioner*, 76 T.C. 468, 478–479 (1981), affd. 720 F.2d 664 (3d Cir. 1983).

---

[1]See 2 J. Mertens, Law of Federal Income Taxation, sec. 17.11 (1982 rev.).

In resolving this question, we must bear in mind that in cases such as this, where a taxpayer alleges that income generated by his personal labor was earned not on his own behalf but on behalf of a third party, the "choice of the proper taxpayer revolves around the question of which person or entity * * * controls the earning of the income rather than the question of who ultimately receives the income." *Vercio v. Commissioner*, 73 T.C. 1246, 1253 (1980); *Vnuk v. Commissioner*, 621 F.2d 1318, 1320 (8th Cir. 1980), affg. a Memorandum Opinion of this Court; *Johnson v. United States*, 698 F.2d 372, 374 (9th Cir. 1982); *Johnson v. Commissioner*, 78 T.C. 882, 891, (1982), affd. without published opinion 734 F.2d 20 (9th Cir. 1983), cert. denied 469 U.S. ____ (1984); *Pacella v. Commissioner*, 78 T.C. 604, 622 (1982).

After reviewing all of the facts in this case, I would hold that: (1) Upon her admission to the Order, petitioner, by enforceable agreement, became an agent of the Order, a separate and distinct principal, for purposes of furthering the expressed goals of the Order; (2) petitioner's acceptance and conduct of her duties at the clinic was within the scope of her agency relationship; (3) because of the nature of petitioner's agency relationship with the Order, as well as her relationship with the clinic and NHSC, the Order, and not petitioner, in every real sense, controlled the earning of the income at issue; (4) accordingly, the income at issue is not properly taxable to petitioner.

An agency relationship is defined as "the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." Restatement Agency, sec. 1(1). Generally, the scope of an agent's authority to act "can be created by written or spoken words or other conduct which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account." Restatement Agency, sec. 26. Whether the requisite consent and control for the creation of an agency relationship are present in any given case must be resolved by an examination of all the facts and circumstances. Restatement Agency, sec. 15.

The facts in this case reveal that, as a precondition to her admission to the Order, petitioner was required to undertake a vow of obedience whereby petitioner, inter alia, agreed to:

embrace the Father's will as it is expressed in the constitution [of the Order] and as it is mediated through those who exercise authority in our congregation.

The purposes of the Order, as expressed in its articles, included, inter alia:

to conduct hospitals and institutions for the care and treatment of suffering humanity and to do all and everything necessary or convenient for the accomplishment of any purposes or objects and powers above mentioned or incidental thereto.

In addition to expressly agreeing to act under the direction of the Order in furtherance of the purposes of the Order, and as a further precondition to her admission to the Order, petitioner agreed that she would give over to the Order everything she earned in pursuit of the purposes of the Order, and accept from the Order only that which is necessary to satisfy her basic needs. As a corollary to her vow of poverty, petitioner agreed never to claim or demand, directly or indirectly, any wages, compensation, or other remuneration for services she performed in furtherance of the purposes of the Order. The majority correctly so finds.

Having satisfied these requisites, petitioner was admitted to the Order, and having been admitted, petitioner's vows of obedience and poverty became valid and enforceable contract obligations. *Order of St. Benedict of New Jersey v. Steinhauser*, 234 U.S. 640 (1914).

Taken together, the admission of petitioner into the Order and the agreements of petitioner outlined above, manifest the consent of the Order that petitioner act on its behalf, subject to its direction and control, in furtherance of the purposes of the Order, as well as petitioner's consent to so act, on the Order's account, and for its benefit. A principal-agent relationship between the Order and petitioner was therefore, by definition, created upon petitioner's admission to the Order. Restatement Agency, sec. 1.

It is clear on this record that the agency relationship, thus created in form, was abided by in practice and substance by

both petitioner and the Order with respect to petitioner's employment at the clinic. The Provincial Superior, in conjunction with the placement board of the Order, is vested with sole authority to approve or disapprove a proposed mission. Pursuant to her vow of obedience, petitioner could neither apply for nor accept a position of employment without express approval of and direction by the Order, and such approval would be granted by the Order only upon its determination that the proposed mission work would further the purposes of the Order. In accordance with these requirements, prior to interviewing for the position with the clinic, petitioner sought permission from the Order to do so, and, after the Order determined that the nature of the employment at the clinic would be in keeping with the goals of the Order, such permission was granted.

After petitioner was interviewed for a position at the clinic and was informed that a position was available to her, she relayed this information to her superiors at the Order and requested permission to accept the position. The Order then contacted the clinic and offered to contract with the clinic for the services of petitioner. As set out in our findings, the clinic, by letter to the Order, formally accepted petitioner on their nurse-midwifery staff, and was fully aware of petitioner's relationship with the Order. Moreover, when petitioner applied for the position with NHSC so that NHSC, rather than the clinic, would assume financial responsibility for petitioner's services, petitioner specifically stated in her application that she would accept an offer with NHSC only if she would be assigned to perform services at the clinic. Petitioner's personnel folder from NHSC contains a letter from the Order dated June 26, 1979, calling attention to the fact that petitioner was a member of the Order and that her services would be performed for NHSC "on behalf of the Order as its agent." Moreover, petitioner's personnel folder contains another letter from the Acting Provincial Administrator of the Order, to the Department of Health and Human Services, wherein the Order proposed to contract with NHSC for petitioner's services. Although no formal contract was entered into between the Order and NHSC for petitioner's services, it is nevertheless clear that NHSC was fully informed of petitioner's relationship with the Order, and that it did not object to her status.

Petitioner's agency status was thus explicitly disclosed by the Order and accepted by the clinic, and implicitly accepted by NHSC.

Although petitioner's day-to-day activities as a midwife were directed by her supervisors at the clinic, petitioner nevertheless remained subject to the ultimate control of the Order during her tenure there. The Order conducted an annual review of each mission to determine whether it was in conformity with the purposes of the Order, and from time to time visited each Sister at the mission site to verify the mission, in practice, furthered the objectives of the Order. Moreover, if at any time the Order determined that petitioner's mission failed to conform to the objectives of the Order, the Order possessed authority to require petitioner to withdraw from the mission, and petitioner, pursuant to her vow of obedience, was under a duty to follow any such command, and would have done so. It is clear that at all times during her employment at the clinic, petitioner remained under the ultimate control of the Order.

It is also clear that petitioner's work at the clinic was within the scope of the agency relationship. As indicated *supra*, one of the purposes of the Order was to provide medical care for those in need. Clearly petitioner's services as a midwife at a health clinic which provides services to the poor further such purposes.

Finally, all proceeds generated by petitioner's work at the clinic on the Order's behalf, pursuant to petitioner's obligation, were paid over to the Order. The Order provided petitioner with only the minimum basic necessities of life that all Sisters of the Order received, and there was a complete absence of any device whereby petitioner derived any benefit, directly or indirectly, through a rebate determined by reference to her salary.

On these facts, I would hold that the income generated by petitioner's services as a midwife was earned by her as an agent of the Order, and not in her individual capacity.

The primary theory respondent advances, and which the majority regrettably embraces, is styled by respondent as a "triangle theory." Under this theory, where, as here, an individual's personal labors generate income, a finding that such income was earned on behalf of a separate and distinct

principal is preconditioned upon a subsidiary finding that a contract or other express agreement existed between the payor of the income and the alleged principal, wherein the alleged principal expressly grants the payor the right to use the individual's services on the principal's behalf. It is not enough, the majority holds, that a relationship exist solely between petitioner and her Order; in addition, they say, NHSC must have expressly contracted with the Order for petitioner's services before the Order is to be considered the true earner of income. Otherwise, it is said, petitioner may properly be viewed only as an "employee" of NHSC, and such status is inconsistent with the proposition that the income at issue was earned by petitioner as an agent for the Order. This is the broad position asserted by respondent in a recent revenue ruling. See Rev. Rul. 83–127, 1983–2 C.B. 25. The majority primarily relies upon *Johnson v. United States, supra*, and *Johnson v. Commissioner, supra*, as support for its conclusion that an express contract for petitioner's services between the Order and NHSC is an absolute prerequisite to a finding that petitioner was acting as an agent of the Order in rendering services to the clinic.

The "triangle" theory applied here is premised upon an inaccurate appraisal of the law of agency as well as the facts of this case.

First, as discussed above, an agency relationship is, by definition, created when one individual or entity grants consent to another that the other shall act on his or its behalf, and the other consents to so act. Restatement Agency, sec. 1. Thus, only two parties are required to create an agency relationship. The majority—erroneously, in my opinion—rejects this proposition.

Second, it is equally clear that an individual may simultaneously act as an agent for two principals with respect to the same activities so long as the services rendered on behalf of one principal do not constitute an abandonment of the relation with the other. Restatement Agency, sec. 226. Thus, contrary to the clear implications of the majority opinion, even if petitioner qualified as an "employee" (which is merely one type of agent) of NHSC under technical agency rules, see Restatement Agency, sec. 2, such status is not inconsistent with a finding that the income earned in that capacity was

earned on behalf of and as an agent for the Order, so long as her assumption of her position at the clinic did not constitute an abandonment of her relation with the Order.[2]

Petitioner, in assuming the position at the clinic, did not in any manner abandon her relationship with the Order. To the contrary, petitioner was authorized and directed by the Order to accept the position, remained subject to the ultimate direction and control of the Order at all times, and the position itself was in furtherance of the purposes of the Order. Moreover, although the Order did not expressly contract with NHSC for petitioner's services, petitioner's status as agent of the Order was expressly disclosed to NHSC, and implicitly accepted by it. Under these circumstances, petitioner's status as an "employee" (as that term is defined under general rules of agency law) of NHSC does not negate the fact that the income at issue was earned by her in her capacity as agent of the Order.

The majority's reliance on *Johnson v. United States, supra,* and *Johnson v. Commissioner, supra,* is misplaced. In these cases, the taxpayer, a professional basketball player, executed a contract with an unrelated corporation whereby he granted the corporation the right to his services in professional sports for a limited time in return for payment by the corporation of a monthly sum. During the years in issue, the taxpayer played for a professional basketball club with which he signed player contracts. However, the basketball club "adamantly refused" to recognize the corporation's controlling position over the taxpayer and expressly refused to sign any contract or agreement with the corporation for petitioner's services. *Johnson v. Commissioner,* 78 T.C. at 893. This Court and the Ninth Circuit Court of Appeals held that, under these circumstances, the basketball player, and not the corporation, was to be considered the true earner of the income generated by the basketball player's activities with the club, despite the fact that all such amounts were paid over to the corporation.

---

[2]The majority lays great stress on the fact that petitioner was carried as an "employee" on the rolls of NHSC, which actually issued her pay checks. The facts show, however, that petitioner was actually employed at the clinic, with funds provided by NHSC. Except for its own bureaucratic reasons, it appears that NHSC could just as well have provided the funds to the clinic, which in turn could have issued its pay check to petitioner. It is clear that it was the clinic, a Catholic charity, which directed petitioner's day-to-day nursing activities, and not NHSC. Cf. Rev. Rul. 68-123, 1968-1 C.B. 35; Rev. Rul. 77-290, 1977-2 C.B. 26.

*Johnson v. United States, supra,* and *Johnson v. Commissioner, supra,* thus present a completely different situation than that presented here. The payor of the income in those cases expressly and "adamantly" refused to recognize the corporation's controlling status and the taxpayer nevertheless assumed a position with the basketball club. Under these circumstances it can reasonably be said that the taxpayer, by accepting a position with the basketball club, had abandoned his agency relationship with the corporation. In the present case, however, no such conclusion is warranted since petitioner's status as agent of the Order was disclosed and accepted by the clinic and NHSC. Although the presence of an executed contract between the Order and NHSC may have been advisable from a taxplanning viewpoint, in light of respondent's current ruling position, the absence of such a written contract is not fatal to petitioner's case. Indeed, we have held that the presence of such a contract is not an absolute prerequisite to a finding that income generated by an individual's efforts is earned on behalf of a separate and distinct entity. *Pacella v. Commissioner,* 78 T.C. at 618–619, 622.

In elevating the "triangle theory" into a rule of the law of agency, I think the majority goes too far. The most that can be said for it is that where the facts of a given case show that the outside employer has refused to deal with the prospective employee as the agent for another, but only in his individual capacity, the consummation of an employment agreement between the parties may fairly be viewed as an abandonment of the employee's prior ongoing relationship with his principal, or at least as an employment outside the scope of the agency. *Johnson v. United States, supra; Johnson v. Commissioner, supra.*[3] That was clearly not the case here.

The majority relies upon *Samson v. United States,* 4 Cl. Ct. 325 (1984), affd. 743 F.2d 884 (Fed. Cir. 1984). However, in *Samson,* the issue presented to the Court was whether services performed by a member of a religious order for a State governmental unit constituted "employment" within the intendment of the Federal Insurance Contributions Act (FICA),

[3]We are not called upon here to consider the tax implications of an employment arrangement where an agent is working for an undisclosed principal. I note, however, that respondent's position in the present case appears to be at odds with his earlier published position in Rev. Rul. 58–515, 1958–2 C.B. 28, and see Restatement Agency, sec. 186.

not whether the income generated by the member's activities was properly taxable to her under section 61. I express no opinion on the correctness of the result reached in *Samson*. Suffice it to say, that the case is simply inapposite here. Whether income generated by an individual's activities is subject to FICA is an entirely separate question from whether the individual is properly subject to *income* tax thereon. Cf. *McGahen v. Commissioner, supra* at 480–481.[4]

The majority also relies on the recent case of *Fogarty v. United States*, 6 Cl. Ct. 612 (1984), on appeal (Fed. Cir., Jan. 16, 1985), in which a Roman Catholic priest, with the same essential relationship to his order as the petitioner has in this case, who accepted a teaching position with a secular university with the consent and direction of his order, and turned over all his salary to his order pursuant to his vows, was held to be personally taxable on such salary. I agree that the controlling facts in *Fogarty* are indistinguishable from the facts in the present case; with respect, I think that *Fogarty* is wrong.

In *Order of St. Benedict of New Jersey v. Steinhauser, supra*, the decedent, a member of a teaching order with vows of poverty, chastity, and obedience, had a distinguished career as an author of learned works and a teacher at various institutions during his lifetime. In these pursuits, he earned royalties and other emoluments which he failed to turn over to his order, as he was required to do. Upon his death, therefore, he left an estate of some value, a situation inconsistent with the vows he had professed to his order. Litigation then ensued between the decedent's administrator and the order, as to who was entitled to decedent's estate. The Supreme Court held that the vows made by decedent to his order were a condition to his admission to the order, and when he was admitted, a binding and enforceable contract was created between them. As the result, the order was held to be the true owner of the assets of decedent's estate.

Steinhauser, although not a tax case, is instructive. It teaches us that the relationship between petitioner here and her Order was founded in a mutual, valid, and enforceable

---

[4]For similar reasons, I would reject the analysis adopted by respondent in Rev. Rul. 77–290, 1977–2 C.B. 26, wherein he relies upon secs. 3121(b)(8)(A) and 3401(a)(9) (defining "wages" for withholding purposes) and the regulations promulgated thereunder, in concluding that payments to a member of a religious order are *income* under sec. 61.

contract, and that she was the servant and agent of her Order. Had petitioner kept her paychecks for herself, I would have no difficulty in finding her taxable thereon, as having taken them under claim of right and converted them to her own use. *Kelley v. Commissioner*, 62 T.C. 131 (1974). On the other hand, the contract here between this petitioner and the Order was scrupulously observed by both sides. Petitioner clearly did not receive her paychecks under claim of right for herself, but only on behalf of, and as agent for, her Order, and she derived no personal benefit therefrom.

I do not think that *Lucas v. Earl* has overruled *Steinhauser*, nor has it repealed the law of agency as it applies to income tax cases. Petitioner at all times relevant, acting strictly in accordance with her vows, transmitted all funds generated by her labors to the Order. Petitioner did not have authority to exert dominion and control over the income at issue, and in fact, did not. The agency relationship created between petitioner and the Order was legal, binding, and was respected in substance.

I think that a blind and indiscriminating application of *Lucas v. Earl* to the facts of this case is neither required nor appropriate. I therefore conclude that the income at issue was received by petitioner in her capacity as agent of the Order; accordingly, she is not properly taxable thereon. *Maryland Casualty Co. v. United States, supra.*

FAY, GOFFE, NIMS, WHITAKER, SHIELDS, and SWIFT, *JJ.*, agree with this dissent.