REINALDO MOURIZ AND MARIA E. MOURIZ, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Mouriz v. Commissioner
Docket No. 32259-83.
United States Tax Court
T.C. Memo 1986-43; 1986 Tax Ct. Memo LEXIS 569; 51 T.C.M. (CCH) 392; T.C.M. (RIA) 86043; January 29, 1986. *569 Over a period of 6 months in 1979 and 1980, petitioner-husband engaged in six currency transactions in which he received an aggregate of $439,988 in small-denomination bills. None of this money was reported on petitioners' joint tax returns. Also, other income was omitted for 1980. Held: (1) Respondent has proven fraud by clear and convincing evidence as to petitioner-husband for 1979 and 1980, and as to petitioner-wife for 1980. Additions to tax imposed. Sec. 6653(b), I.R.C. 1954. (2) Respondent has failed to carry his fraud burden of proof as to petitioner-wife for 1979. (3) Petitioners have failed to carry their burden of proof as to the deficiencies for 1979 and 1980. Luis Medina, for the petitioners. John F. Hernandez, for the respondent. CHABOT
MEMORANDUM FINDINGS OF FACT AND OPINION CHABOT, Judge: Respondent determined deficiencies in Federal individual income taxes and additions to tax under section 6653(b)[1] *570 (fraud) as follows: Year
Deficiency [2]
Addition to Tax--Sec. 6653(b)
1979
$91,102.70
$47,646.85
1980
131,520.25
65,760.13 After concessions by both sides, the issues for decision are as follows: (1) Whether each of the petitioners is liable for an addition to tax under section 6653(b) for each of the years in issue; and (2) How much, if any, of the $229,997 and $209,991 that petitioner-husband received from certain banks in 1979 and 1980, respectively, is includible in petitioners' income for these years. FINDINGS OF FACT Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference. When the petition was filed in the instant case, petitioners Reinaldo Mouriz (hereinafter sometimes referred to as "Reinaldo") and Maria E. Mouriz (hereinafter sometimes referred to as "Maria"), husband and wife, resided in Miami, Florida. 1979 Tax Return
Petitioners filed their 1979 tax return on October 15, 1980. To the tax return there was attached a Form 4868, Application for Automatic Extension of time to File U.S. Individual Income Tax Return. On the Form 4868, dated April 14, 1980, petitioners *571 stated that they expected not to owe any income tax for 1979. The purpose of the Form 4868 was to secure for petitioners a 2-month extension of time, until June 15, 1980, to file the 1979 tax return. To the tax return there also was attached a Form 2688, Application for Extension of Time to File. On the Form 2688, dated June 10, 1980, petitioners asked for an extension of time until August 15, 1980, to file the 1979 tax return, and stated that "Additional time is necessary as the accountant has not completed analyzing all distributions the taxpayer received from domestic and foreign entities." On their 1979 tax return, petitioners reported income in the amounts and from the sources indicated in table 1. Table 1 Amount
Source
$ 9,710
Wages--Maria--Roche Clinical Labs, Inc.
10,200
Wages--Reinaldo--Diaz Marble Co., Inc. [3]
187
Interest
1,878
Rent, royalty income
5,200
"Miscellaneous" [4] *572 $27,175
On their 1979 tax return, petitioners reported a chapter 1 income tax liability of $3,770 (determined by use of income averaging), a chapter 2 self-employment tax liability of $421, a total liability of $4,191, a withholding credit of $2,325, and a balance due of $1,866. Petitioners' 1979 tax return was prepared by Wilfred Braceras (hereinafter sometimes referred to as "Braceras"), who enquired into both petitioners' sources and amounts of income and included on the tax return all such information provided by petitioners. Any information included or excluded from the tax return was so treated by Braceras with petitioners' express knowledge and consent. 1980 Tax Return
Petitioners filed their 1980 tax return on October 15, 1981. To the tax return there was attached a Form 4868. On the Form 4868, dated April 10, 1981, petitioners stated that they expected not to owe any income tax for 1980. The purpose of the Form 4868 was to secure for petitioners a 2-month extension of time, until June 15, 1981, to file the 1980 tax return. To the tax return there also were attached two Forms 2688. On the first Form 2688, dated June 15, 1981, petitioners *573 asked for an extension of time until August 15, 1981, to file the 1980 tax return and stated that "Additional information is being forwarded to the return preparer so that a proper and complete return may be filed." On the second Form 2688, dated August 13, 1981, petitioners asked for an extension of time until October 15, 1981, to file their 1980 tax return and stated that "Additional information is still being accumulated and researched by the taxpayer to be forwarded to the return preparer to enable the return preparer to file a proper and complete return." On their 1980 tax return, petitioners reported income in the amounts and from the sources indicated in table 2. Table 2 Amount
Source
$16,218 Wages--Reinaldo
144 Interest
(22)
Rent, royalty income
5,200 "Miscellaneous" (see n.4, supra)
$21,540
On their 1980 tax return, petitioners reported a chapter 1 income tax liability of $2,583, a chapter 2 self-employment tax liability of $421, a total liability of $3,004, a withholding credit of $1,882, and a balance due of $1,122. [5] *574 Petitioners' 1980 tax return was prepared by Edward Guttenmacher (hereinafter sometimes referred to as "Guttenmacher"), who enquired into both petitioners' sources and amounts of income and included on the tax return all such information provided by petitioners. Any information included on or excluded from the tax return was so treated by Guttenmacher with petitioners' express knowledge and consent. Currency Transactions
Reinaldo engaged in the currency transactions described in table 3. Table 3 Date of check/
Amount of
transaction
Drawer of check
check
Sep. 12/13, 1979
Banco Immobilario, S.A.
$100,000
Sep. 27/27, 1979
Banco Immobilario, S.A.
100,000
Dec. 6/18, 1979
The Bank of Miami
29,997
1979 Total
$229,997
Jan. 4/4, 1980
The Bank of Miami
34,997
Feb. 28/29, 1980
The Bank of Miami
99,997
Mar. 6/10, 1980
The Bank of Miami
74,997
1980 Total
$209,991
In each instance, Reinaldo was notified by someone at a branch of the Bank of Miami that a check made out to him was at the bank; Reinaldo drove alone to the bank and parked in a nearby parking lot; he walked from there to the bank; he identified himself; he endorsed the check; he received the money in small-denomination *575 bills; [6] he put the money in a briefcase; he went back to his car; and he placed the briefcase in the trunk of his car. Other Income
In 1980, Maria was employed by Roche Clinical Labs, Inc.; she was paid $11,018 for her services. From this amount, $1,231.70 was withheld as Federal income tax and $665.12 was withheld as F.I.C.A. (Social Security) tax. Petitioners' 1980 tax return does not include these amounts. In 1980, petitioners received $201 in interest income from Dade Federal Savings and Loan Association, and $143 in interest income from First National Bank. Petitioners' 1980 tax return includes only $144 in interest income. * * * For each of the years 1979 and 1980, petitioners had an underpayment of income taxes required to be shown on their tax return; some part of each such underpayment was due to fraud on the part of Reinaldo; some part of the 1980 underpayment was due to fraud on the part of Maria. OPINION Respondent contends that the entire amounts *576 involved in the currency transactions (see table 3, supra) constitute income to petitioners for 1979 ($229,997) and 1980 ($209,991), and that the omission of these amounts from petitioners' tax returns for these years (and the omission from petitioners' 1980 tax return of $11,018 in Maria's wages and $200 in interest) "was engaged in willfully and fraudulently with intent to evade or defeat tax." Petitioners contend that none of the amounts involved in the currency transactions belonged to petitioners but that Reinaldo was acting on behalf of South Caicos Pride Fisheries, and that there was no deceit by petitioners. We agree with respondent, except that we agree with petitioners as to fraud on the part of Maria for 1979. I. Fraud
When respondent seeks to impose the addition to tax under section 6653(b), [7] *577 he bears the burden of proving by clear and convincing evidence that petitioner has an underpayment, and that some part of this underpayment is due to fraud. Section 7454(a); [8] Rule 142(b); [9] e.g., Stone v. Commissioner,56 T.C. 213, 220 (1971); Otsuki v. Commissioner,53 T.C. 96, 105 (1969). The issue of fraud poses a factual question which is to be decided on an examination of all the evidence in the record. Plunkett v. Commissioner,465 F.2d 299, 303 (CA7 1972), affg. a Memorandum Opinion of this Court; [10]Mensik v. Commissioner,328 F.2d 147 (CA7 1964), *578 affg. 37 T.C. 703 (1962); Stone v. Commissioner,56 T.C. at 224; Stratton v. Commissioner,54 T.C. 255, 284 (1970). Fraud is an actual intentional wrongdoing, and the intent required is the specific purpose to evade a tax believed to be owing. E.g., Webb v. Commissioner,394 F.2d 366, 377 (CA5 1968), affg. a Memorandum Opinion of this Court; [11]Powell v. Granquist,252 F.2d 56, 60 (CA9 1958); Estate of Pittard v. Commissioner,69 T.C. 391, 400 (1977); McGee v. Commissioner,61 T.C. 249, 256-257 (1973), affd. 519 F.2d 1121 (CA5 1975). This intent may be inferred from circumstantial evidence (Powell v. Granguist, 252 at 61; Gajewski v. Commissioner,67 T.C. 181, 200 (1976), affd. without published opinion 578 F.2d 1383 (CA8 1978); Beaver v. Commissioner,55 T.C. 85, 92-93 (1970)), including the implausibility of the taxpayer's explanations. Boyett v. Commissioner,204 F.2d 205, 208 (CA5 1953), affg. a Memorandum Opinion of this Court. [12]
Respondent need not prove the precise amount of underpayment resulting from fraud, but only that there is some underpayment and that some part of it is attributable to fraud. E.g., *579 Lee v. United States,466 F.2d 11, 16-17 (CA5 1972); Plunkett v. Commissioner,465 F.2d at 303; Kreps v. Commissioner,351 F.2d 1, 6 (CA2 1965), affg. 42 T.C. 660 (1964). In carrying his burden, respondent may not rely on petitioners' failure to meet their burden of proving error in respondent's determinations as to the deficiencies (e.g., Habersham-Bey v. Commissioner,78 T.C. 304, 312 (1982), and cases there cited). Petitioners concede that Reinaldo received the $439,988 in the Bank of Miami currency transactions. They claim, essentially, that the money was not Reinaldo's. (See discussions of conduit and other theories in, e.g., Schuster v. Commissioner,84 T.C. 764 (1985), on appeal (CA7, July 23, 1985); Diamond v. Commissioner,56 T.C. 530 (1971), affd. 492 F.2d 286 (CA7 1974).) In his testimony, Reinaldo described the situation essentially as follows: At some time around 1975, Mavis Harvey Shelley (hereinafter sometimes referred to as "Shelley") came to Diaz Marble Company, Inc.'s place of business (see n.3, supra), to look for a piece of marble.In the next few years, Shelley returned to Diaz Marble Company, Inc., several times to look for marble items. On one occasion, Reinaldo *580 sold a small marble table to her. A friendship developed between the two of them. In late 1978 or early 1979, Shelley told Reinaldo that she wanted to build a plant on South Caicos Island (an island in the Caribbean nation of Turks and Caicos Islands) for South Caicos Pride Fisheries (hereinafter sometimes referred to as "Fisheries"), a company which Shelley owned. The plant was to enable Fisheries to process lobsters, fish, and conch. She asked Reinaldo to buy materials, building equipment, and machinery in the Miami area and ship it to South Caicos, so that she could use it to build the plant. Reinaldo visited South Caicos Island for the first time in 1979. He saw the site of Fisheries' plant, but no construction work had yet begun. Shelley and others who were involved in the construction told Reinaldo what building and other materials (e.g., blocks, cement, plywood, nails) were needed. When Reinaldo returned to Miami, he went price-shopping, and then reported his results to Shelley. Shelley told Reinaldo to order specific items, but not to pay for them until she sent him money. Shelley transferred money to the Bank of Miami for Reinaldo. Reinaldo received the money in small-denomination *581 bills. Reinaldo paid cash for everything that he bought for Fisheries. The sellers delivered the items to shipping companies. Reinaldo paid cash for the services of the shipping companies. All of the money Reinaldo spent for Fisheries (purchases and shipping) was in cash and all of it was from the small-denomination bills that Reinaldo received at the Bank of Miami (see table 3, supra). Reinaldo never paid for any Fisheries item out of his own funds. Reinaldo never advanced funds to pay for any Fisheries' item in anticipation of later reimbursement. Reinaldo never received money for any Fisheries item other than the money received in the course of the six currency transactions described in the Findings of Fact, supra.
Shelley never compensated Reinaldo for his services, although she had promised to do so. The only money that he received was the $439,988 in the Bank of Miami currency transactions, plus reimbursement of his expenses, such as his expenses on visits to South Caicos in connection with his purchasing and shipping activities. All of the $439,988 was spent by Reinaldo in the foregoing activities on behalf of Fisheries and under Shelley's authorizations. Shelley largely *582 corroborated Reinaldo's testimony, although there were a number of discrepancies. We do not believe Reinaldo's story, even where it was corroborated by Shelley. Firstly, both Reinaldo and Shelley testified that all of Reinaldo's expenditures for Fisheries (purchases and shipping) were made in cash out of the funds received by him in the Bank of Miami currency transactions. Reinaldo testified that he never used his own funds for those purposes. Both Reinaldo and Shelley testified that every item appearing in certain invoices, customs forms, and shipping bills received into evidence was paid for by Reinaldo in this manner. In their testimony, both Reinaldo and Shelley "tracked" several items through customs forms and shipping bills to show when and how the steps occurred in securing, transporting, and paying for the items. (a) At least seven of the invoices, totalling about $2,800, were paid before the first of the currency transactions. (b) At least five of the customs forms (Shipper's Export Declaration) for items (apparently not reflected in the invoices), totalling about $21,000, were for items exported before the first of the currency transactions. (c) At least nine of the shipping *583 bills, totalling about $12,000, were paid before the first of the currency transactions. Thus, Reinaldo and Shelley would have us believe that Reinaldo paid at least $36,000 in cash before receiving any money from the currency transactions and they would also have us believe that Reinaldo did not pay anything before he received any money from the currency transactions. We must emphasize that this is not merely a conflict between Reinaldo's testimony on the one hand and Shelley's testimony on the other hand. Rather, the conflict appears within the testimony of Reinaldo and also within the testimony of Shelley. The magnitude of the discrepancy--some $36,000 in 21 payments--convinces us that this was not merely a matter of a failure to remember some small item in testimony given 6 years after the event. The $36,000 discrepancy is substantially more than the total adjusted gross income that petitioners acknowledge for either of the years in issue. [13] *584 Secondly, Reinaldo testified that he was not compensated at all for his extensive activities on behalf of Fisheries. Shelley testified that she compensated Reinaldo in the amount of $800 or $1,000 per month (depending on the extent of Reinaldo's activities during the month) from November 1979 to September or October 1980. Then Shelley testified that all of this was merely to reimburse Reinaldo for his expenses. Then Shelley testified that she paid Reinaldo about $100 or $200 as compensation for his services, *585 in addition to reimbursing him for his expenses.We do not believe that Reinaldo would have continued the extensive work involved in pricing, ordering, paying for, and shipping the various items, not to mention the dangers involved in travelling around Miami with large amounts of small-denomination bills, without being compensated for his labors. Thirdly, Reinaldo testified that he spent the entire $439,988 for Fisheries in about 12 months without keeping any records of what he spent. We observed Reinaldo on the stand. We do not believe that if he had really been engaged in the apparently above-board activities he described he would have been so unconcerned about being able to show that he had faithfully discharged his trust and not kept some of the funds. Fourthly, the project for which the $439,988 allegedly was spent was the construction of Fisheries' plant on South Caicos. Shelley testified that the plant cost only $85,000, including labor. We do not believe that Reinaldo spent $439,988--or any amount approaching that sum--on the purchasing and shipping of items for Fisheries. We are convinced that Reinaldo either kept all or part of the $439,988, or was compensated for his services *586 in connection with the currency transactions. None of these funds are reported on petitioners' tax returns. We are convinced that petitioners' explanation of what happened is untrue. See Boyett v. Commissioner,supra.Petitioners do not suggest another explanation. Petitioners concede 1980 tax return omissions totalling $11,218 and do not suggest any explanation for these omissions. Petitioners do not suggest that the $5,200 "miscellaneous" income item reported on their tax returns (see n.4, supra) is related to the currency transactions or any other omissions from income. Petitioners concede that their tax return preparers enquired of both of them as to petitioners' sources and amounts of income and that petitioners' tax returns correctly show all the information they provided to their tax return preparers. On the basis of the record as a whole, (1) we conclude that respondent has shown that petitioners omitted income from both their 1979 and 1980 tax returns; (2) we conclude that, since there do not appear to be any offsetting deductions or credits, these omissions of income result in an underpayment of tax required to be shown on their tax return for each of the years in issue; *587 [14] (3) we conclude, and we have found, that some part of the 1979 underpayment is due to fraud on the part of Reinaldo; and (4) we conclude, and we have found, that some part of the 1980 underpayment is due to fraud on the part of each petitioner. The foregoing has been proven by clear and convincing evidence. As to 1979, we note that the entire overpayment results from the 1979 currency transactions. Respondent has failed to persuade us by clear and convincing evidence that Maria knew that petitioners' 1979 joint tax return should have included income on account of these transactions. We hold for respondent as to Reinaldo for 1979 and 1980. We hold for respondent as to Maria for 1980. We hold for petitioners *588 as to Maria for 1979. II. Deficiencies
Petitioners have the burden of proving that respondent erred in his determinations in the notice of deficiency (other than his determinations as to fraud, discussed supra). Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). Except insofar as respondent has conceded that the $439,988 is to be treated as personal service income within the meaning of section 1348 ("maxitax"), [15] petitioners have failed to carry their burden of proof. (Respondent's concession as to petitioners' entitlement to credit against tax for income tax withheld from Maria's wages in 1980 does not affect the amount of the deficiency for 1980, although it does, of course, reduce the amount petitioners have to pay.) We hold for respondent on this issue. Decision will be entered under Rule 155.
Footnotes
1. Unless indicated otherwise, all section and chapter references are to sections and chapters of the Internal Revenue Code of 1954 as in effect for the years in issue. 2. Of these amounts, self-employment taxes under chapter 2 are $607.70 for 1979 and $363.25 for 1980; the remaining amounts are chapter 1 income tax.↩
3. Reinaldo was a one-third owner of Diaz Marble Co., Inc., where he was employed as an appraiser or job estimater. Diaz Marble Co., Inc., went out of existence in 1981. ↩
4. The $5,200 "miscellaneous" item is not further described on petitioners' 1979 tax return, except that it also appears on Schedule SE as net earnings from nonfarm self-employment of Reinaldo.
5. To their 1980 tax return, petitioners attached a Form 2210, Underpayment of Estimated Tax by Individuals, showing a "penalty" (evidently, this is an addition to tax under section 6654(a), and not a penalty) of $42.
6. Each of the Bank of Miami's currency transaction reports stated that none of the money was in denominations of $100 or greater. Reinaldo testified that he thought he received the money in denominations from $5 through $100.↩
7. SEC. 6653. FAILURE TO PAY TAX. * * * (b) Fraud.--If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. * * * In the case of a joint return under section 6013, this subsection shall not apply with respect to the tax of a spouse unless some part of the underpayment is due to the fraud of such spouse. [The subsequent amendment of this provision by section 325(a) of the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, 96 Stat. 324, 616, does not affect the instant case.] ↩
8. SEC. 7454. BURDEN OF PROOF IN FRAUD, FOUNDATION MANAGER, AND TRANSFEREE CASES. (a) Fraud.--In any proceeding involving the issue whether the petitioner has been guilty of fraud with intent to evade tax, the burden of proof in respect to such issue shall be upon the Secretary. ↩
9. Unless indicated otherwise, all rule references are to the Tax Court Rules of Practice & Procedure.↩
10. T.C. Memo. 1970-274↩.
11. T.C. Memo. 1966-81↩. 12. Dated March 14, 1951.↩
13. "That's the way it's done," the Queen said with great decision: "nobody can do two things at once, you know. Let's consider your age to begin with--how old are you?" "I'm seven and a half, exactly." "You needn't say 'exactly,'" the Queen remarked. "I can believe it without that. Now I'll give you something to believe. I'm just one hundred and one, five months and a day." "I ca'n't believe that!" said Alice. "Ca'n't you?" the Queen said in a pitying tone. "Try again: draw a long breath, and shut your eyes." Alice laughed. "There's no use trying," she said: "one ca'n't believe impossible things." "I daresay you haven't had much practice," said the Queen. "When I was your age, I always did it for half-anhour a day. Why, sometimes I've believed as many as six impossible things before breakfast." Dodgson, C.L., "The Complete Works of Lewis Carroll" (Through the Looking-Glass), p. 200 (Modern Library ed.).↩
14. Petitioners' reported taxable income for 1980 placed them at the marginal tax rate of 24 percent. (Sec. 1(a).) The conceded 1980 omitted income of $11,218 would have produced more additional tax liability than the additional withholding credit of $1,231.70. Thus, although petitioners are entitled to an additional credit for 1980, there is already an unexplained but conceded underpayment for this year even without regard to the $209,991 in the currency transactions for this year.↩
15. The repeal of this provision by section 101(c)(1) of the Economic Recovery Tax Act of 1981 (Pub. L. 97-34, 95 Stat. 172, 183) does not affect the instant case.↩