FADHLALLA HAERI AND MUNEERA HAERI, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Haeri v. Commissioner
Docket No. 43194-86
United States Tax Court
T.C. Memo 1989-20; 1989 Tax Ct. Memo LEXIS 20; 56 T.C.M. (CCH) 1061; T.C.M. (RIA) 89020; January 11, 1989. John E. Vickers, III, for the petitioners. Phillip A. Pillar, for the respondent. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: Respondent determined deficiencies in petitioners' Federal income tax liability and additions to tax for 1981 and 1982 as follows: Additions to Tax
Year
Deficiency
6653(a)(1) [1]
6653(a)(2)
6661(a)
1981
$ 4,617,846
$ 230,892 * $ 1,594,054
1982
424,230
21,212 ** 87,615
$ 42,424
Respondent determined that petitioners' *23 understatement of income tax was "substantial" as defined in section 6661 and imposed an addition to tax equal to 10 percent of the underpayments attributable to such understatement. After concessions, the issues remaining for decision are: (1) whether depositions of Dean Gesterkamp and petitioner Fadhlalla Haeri should be admitted in evidence under Federal Rules of Evidence 803 and 804; (2) whether commissions paid by Ashland Oil Company in the amounts of $ 2,946,930 and $ 123,954 in 1981 and 1982, respectively, constitute taxable income to petitioner Fadhlalla Haeri; (3) whether distributions by companies controlled by petitioners in the amounts of $ 3,880,847 and $ 780,859 in 1981 and 1982, respectively, constitute taxable income to petitioners; (4) whether any part of an underpayment of taxes for 1981 and 1982 was due to negligence or intentional disregard of rules and regulations within the meaning of section 6653(a)(1) and (2); and (5) whether petitioners are liable for an addition to tax under section 6661(a) for 1982. DEPOSITION TESTIMONY By consent of the parties, respondent deposed the following *24 witnesses in London, England: (1) Fadhlalla Haeri, (2) Muneera Haeri, (3) Hosam Raouf, and (4) Dean Gesterkamp. At trial, respondent agreed to stipulate to the testimony of Muneera Haeri and Hosam Raouf. Accordingly, their depositions were received in evidence. Respondent, however, objected to the admission of the remaining two depositions. We postponed ruling on respondent's objections during trial in order to allow the parties an opportunity to present their arguments in briefs. It is necessary to rule on these outstanding objections prior to making findings of fact. Rule 801(c) of the Federal Rules of Evidence (FRE) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." A statement falling within the definition of hearsay under FRE Rule 801(c) is not admissible unless it comes within one of the exceptions to the hearsay rule set forth in FRE Rules 803 and 804. See FRE Rule 802 *25 . Petitioners assert that the deposition of Dean Gesterkamp (Gesterkamp) is admissible under FRE Rule 804(b). In pertinent part, FRE Rule 804(b)(1) provides that former testimony given "in a deposition taken in compliance with law in the course of the same or another proceeding" is not excluded by the hearsay rule "if the party against whom the testimony is now offered * * * had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination" and the declarant is unavailable as a witness. Respondent contends that he did not have a fair opportunity to develop Gesterkamp's testimony at deposition because Gesterkamp failed to appear with certain financial records, and because Gesterkamp's answers were vague. There is no identification in the deposition transcript or trial record, however, of what, if any, documents Gesterkamp failed to produce after being requested to do so. By its terms, FRE Rule 804(b)(1) does not limit the admissibility of evidence based upon its quality, e.g., the credibility of a witness or the specificity of his answers. *26 Petitioners argue that Gesterkamp was "unavailable" because he was beyond the subpoena power of this Court. In pertinent part, FRE Rule 804(a)(5) defines unavailability as a situation in which the declarant "is absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance * * * by process or other reasonable means." A showing of unavailability is a prerequisite to admission of evidence under FRE Rule 804(b)(1). Driscoll v. Schmitt,649 F.2d 631, 632 (8th Cir. 1981). Petitioners' counsel asserted at trial that Gesterkamp, an independent consultant living in Holland, was unavailable because he was outside the subpoena power of this Court. It is within the discretion of this Court to accept counsel's representations about Gesterkamp's unavailability. Bailey v. Southern Pacific Transportation Co.,613 F.2d 1385, 1389-1390 (5th Cir. 1980). We conclude that Gesterkamp was unavailable within the meaning of FRE Rule 804(a)(5) and his deposition testimony is not inadmissible under FRE Rule 804(b)(1) *27 . Goldsmith v. Commissioner,86 T.C. 1134, 1152-1153 (1986). Respondent had the opportunity and similar motive to develop the testimony of Gesterkamp during his deposition; therefore, the specific requirements for the FRE Rule 804(b)(1) exception to the hearsay rule have been met and the deposition transcript will be admitted into evidence. In receiving the deposition, however, we note that its usefulness is significantly limited by the witness' professions of lack of recollection or of knowledge of certain facts; and we disregard hearsay statements within the deposition. Petitioners do not cite any authority in support of their argument to admit the deposition of petitioner Fadhlalla Haeri (petitioner). Petitioner cannot and does not claim his own unavailability. The residual exceptions to the hearsay rule, set forth in FRE Rule 803(24) and FRE Rule 804(b)(5), are not applicable. These residual exceptions were intended "to be used very rarely and only in exceptional circumstances." Goldsmith v. Commissioner,86 T.C. at 1140. The narrow applicability *28 of these exceptions is apparent from their legislative history, as expressed by the Senate Judiciary Committee: The committee does not intend to establish a broad license for trial judges to admit hearsay statements that do not fall within one of the other exceptions contained in rules 803 and 804(b). The residual exceptions are not meant to authorize major judicial revisions of the hearsay rule, including its present exceptions. [S. Rept. 93-1277, 4 U.S. Code Cong. & Adm. News 7065-7066 (1974).] They require that, to be admitted in evidence, a hearsay statement must (1) have circumstantial guarantees of trustworthiness; (2) be offered as evidence of a material fact; (3) be more probative on the point for which it is offered than any other evidence which can be procured through reasonable efforts; and (4) serve the general purposes of the rules of evidence and the interest of justice. These prerequisites have not been met, and we cannot admit petitioner's deposition in evidence over respondent's hearsay objection. Thus, we make no findings of fact based on that deposition. Unfortunately, there was little live testimony at trial. The parties, however, stipulated to *29 depositions from a Securities & Exchange Commission (SEC) investigation, and stipulated that such deposition testimony was true and correct to the best of the knowledge of the witnesses. The depositions have been considered in rendering our findings of fact and opinion. FINDINGS OF FACT Some of the facts have been stipulated, and the facts set forth in the stipulations are incorporated in our findings by this reference. Petitioners were residents of London, England at the time they filed their petition. During 1981 and 1982, petitioners were alien residents of the United States residing in San Antonio, Texas. Petitioners timely filed Federal income tax returns for the years in issue. Background
Petitioner Fadhlalla Haeri (petitioner) was born in Kerbala, Iraq, and was a citizen of Iraq and a Moslem of the Shia sect; his wife Muneera was a citizen of the United Kingdom. Educated as a petroleum engineer in the United Kingdom, petitioner initially worked for various oil companies in the field of petroleum production. Subsequently, petitioner was an officer and a shareholder in Project Development Corporation (PDC), a Panamanian corporation, and was active as a petroleum *30 consultant for oil companies doing business in the Middle East. PDC was a diversified "umbrella" corporation that owned approximately 30 subsidiaries and maintained a large network of connections and personnel throughout the Middle East. During the late 1970's petitioner began to reduce his business activities in the Middle East, and he became increasingly involved in various charitable and religious matters. After 1980, petitioner worked to promote Islam in the United States through the Zahra Spiritual Trust (Zahra Trust), a Texas nonprofit corporation. Zahra Trust operated on a 134-acre site in Blanco County, Texas, on which a mosque and other improvements were constructed. Until the construction in Blanco County was completed, Zahra Trust's activities were conducted on a portion of 24.5 acres of property in Bexar County, Texas, owned in part by petitioners and in part by others known as Dar al-Hikmah. Petitioners were attracted to the United States by its political and economic stability, as well as this country's right to religious freedom. Four of petitioners' children were born in this country, as follows: Child
Date of Birth
Place of Birth
Mohammed
March 25, 1979
Tucson, Arizona
Fadhela
January 2, 1981
San Antonio, Texas
Ali
February 17, 1982
San Antonio, Texas
Ahmed
February 7, 1984
San Antonio, Texas
*31 At the time he ceased to be a full-time consultant with PDC, petitioner was a 47 percent owner of the corporation. The remaining 53 percent of PDC's shares were owned by Hamid Jafar (Jafar) and Hosam Raouf (Raouf). Petitioner handed over his PDC shares to Jafar to be held in trust for the benefit of petitioner and his family. An irrevocable trust, the Fadhlalla Haeri Trust (Haeri Trust), was formally established for this purpose on February 9, 1981, by Jafar as settlor and Jafar, Raouf, and Elwood A. Rickless as Trustees. Petitioner was the sole beneficiary of the Haeri Trust. Pursuant to Article VII of the trust instrument, the Haeri Trust permitted distributions for charitable purposes as well as distributions for petitioner, as follows: 7.1 The Trustees shall pay so much of the income and corpus as in their discretion shall be deemed necessary (i) for the education, travel, maintenance and health, support and comfort of the beneficiaries, to enable them to maintain their accustomed standard of living and (ii) to promote charitable contributions to charities designated by the beneficiaries in such amounts as the Trustees may in their discretion deem appropriate. The following *32 net sums were deposited into bank accounts maintained in petitioners' names at the Frost Colonial Bank, San Antonio, Texas: 1981
[2] $ 2,926,345
1982
$    871,500
These deposits represent receipts of funds from various entities, including the Haeri Trust, Haeri & Associates, and PDC to accounts controlled by petitioners. Haeri & Associates
On June 13, 1975, in accordance with the General Corporation Law of the Republic of Panama, PDC incorporated a wholly-owned subsidiary, Communications and Support Consultants Limited Corp. (CSC). Subsequently, *33 by certificate of amendment dated September 19, 1975, petitioner as president of CSC changed the name of the corporation to Haeri and Associates Limited, S.A. (Haeri & Associates). By petitioner's own admission, Haeri & Associates: was formed * * * as a vehicle, as a convenient vehicle for me if I needed to have any activity or business activity to channel through it basically. * * * It is basically a company that I control. * * * One of the main reasons actually it was formed, was to enable me to reside in the United Kingdom as a representative. So Haeri & Associates original purpose was to enable me to have a corporation in the United Kingdom, after 1975 to be its sole employee, to satisfy residence requirements in the UK. But as such, it had no business activity of any significance. * * * [Haeri & Associates'] main function, actually, if one looks at it, for the record, has really been that consultancy agreement with Ashland. That has been the most, if you like, important or prominent function that it has. And since then there has been no activity under it. Prior to that, for also three or four years, I doubt that there has been any activity. Thus, although he formally *34 was not a majority shareholder, petitioner exercised actual control over Haeri & Associates. The Ashland Agreement
Beginning in 1975, Ashland Oil, Inc. (Ashland) contracted with Abu Dhabi National Oil Co. (ADNOC) to purchase crude oil supplies. During the world-wide crude oil shortage in 1979, however, ADNOC reduced Ashland's contract from 55,000 to 20,000 barrels a day. In an effort to get its oil allotment restored, Ashland, on November 15, 1979, entered into a consulting agreement with Senior Ventures, S.A. (Senior Ventures) and Metronome Enterprises, S.A. (Metronome). Senior Ventures was a wholly-owned subsidiary of PDC, while Metronome was wholly owned by Sadiq Attia [aka Sadik Atia], an unrelated third party. During 1980 and 1981, Ashland paid $ 3,009,286 and $ 1,527,047.50, respectively, to Senior Ventures for its consulting services. Despite the efforts of Senior Ventures and Metronome, Ashland's ADNOC oil allotments continued to decline, and Ashland became dissatisfied with the performance under these consulting agreements. Early in 1980, officials of Ashland met with petitioner and asked for his assistance in terminating these unsuccessful arrangements and *35 in negotiating an increase in Ashland's oil allotment. Petitioner was also requested to obtain a release from Hisham O. Alwan (Alwan), a Middle Eastern oil broker who had asserted claims against Ashland for commissions relating to crude oil purchases by Ashland from ADNOC. Effective July 20, 1981, Haeri & Associates and Ashland Industries (Bermuda) Limited (AIBL) entered into an agreement. Haeri & Associates was to perform certain services for AIBL, in accordance with the following terms of the agreement: 1. Haeri represents that it has extensive consulting experience in international areas including the purchase of crude oil in foreign countries and including experience in dealing with various national oil companies. 2. AIBL has advised Haeri that AIBL has a contract for crude oil with the Abu Dhabi National Oil Company ("Adnoc") for calendar year 1981 for 10,000 barrels per day of crude oil. AIBL has advised Haeri it is desirous of obtaining a renewal of the contract for 1982 and subsequent years on economically feasible terms as well as obtaining additional crude oil from Adnoc, and Haeri has advised AIBL that it is interested in assisting and will endeavor to assist AIBL *36 in obtaining both an extension of the contract as well as additional crude oil. 3. Haeri also agrees it will undertake to act for AIBL in advising AIBL in international crude oil matters and further will endeavor to obtain additional crude oil for AIBL from sources other than and in addition to Abu Dhabi. 4. In addition, Haeri will make available its services for such time and at such locations as requested by AIBL to perform the services, to represent AIBL's interests in Abu Dhabi as AIBL requests, and using its best endeavors in scheduling appointments and correcting errors and misunderstandings. Haeri agrees that it shall make available the services of its key employees, who shall perform for AIBL the services contemplated by this Agreement. Haeri further agrees to make available its expertise as deemed advisable by Haeri and AIBL to accomplish the purposes of this Agreement. 5. For the foregoing services to be rendered by Haeri, AIBL will pay to Haeri a commission with respect to crude oil purchased by AIBL from Adnoc at the following per barrel rate: (i) For crude oil purchased during the first calendar quarter of calendar year 1981, One Dollar Ten Cents U.S. ($ 1.10 *37 U.S.), (ii) For crude oil purchased during the last three calendar quarters of calendar year 1981, Sixty Cents U.S. (60c U.S.), and (iii) Provided AIBL's existing contract with Adnoc has been extended, for crude oil purchased during calendar year 1982 and thereafter: (a) Minimum Commission:
One Dollar Twenty-Five Cents U.S. ($ 1.25 U.S.) for calendar year 1982; One Dollar U.S. ($ 1.00 U.S.) for calendar year 1983 and thereafter; * * * Pursuant to this agreement, petitioner made two or three visits to the Middle East in an attempt to improve Ashland's crude oil allotments from ADNOC. During these visits, petitioner arranged for other PDC officers to meet with senior members of the Middle Eastern business establishment on Ashland's behalf. Although PDC was unable to obtain an increase in Ashland's oil allotment, PDC personnel successfully negotiated the termination of the Senior Ventures and Metronome consulting contracts and obtained a release from Alwan. By a telex dated July 21, 1981, petitioner, acting for Haeri & Associates, instructed AIBL to transfer the appropriate payments under the agreement to a bank account at Manufacturers Hanover Trust Company, Brussels, *38 Belgium. AIBL made the following payments to Haeri & Associates during 1981 and 1982: Date
Amount
July 22, 1981
$ 2,391,919.80
September 4, 1981
195,157.20
November 30, 1981
359,853.60
$ 2,946,930.60
February 1, 1982
123,953.20
Total
$ 3,070,883.80
Tax Reporting
The payments from AIBL to Haeri & Associates were deposited to Haeri & Associates' account at Manufacturers Hanover Bank, Brussels, Belgium, account number 695-094243-400, and then immediately transferred to PDC's account in the same bank, account number 695-094136-401. Petitioners did not report as income any of the payments from AIBL to Haeri & Associates in 1981 and 1982. Petitioners' tax returns for the years in issue were prepared by Charles Dickey (Dickey), an experienced certified public accountant and a retired partner from the accounting firm of Ernst & Whinney. In addition to preparing petitioners' individual tax returns, Dickey also acted as the accountant for Haeri & Associates, Zhara Trust, and other entities. Dickey worked primarily with Mrs. Haeri in preparing these tax returns. Mrs. Haeri provided Dickey with detailed summaries of all funds deposited to petitioners' *39 United States bank accounts. Dickey then reviewed the summaries to determine which funds were to be included as income on petitioners' tax returns. Petitioners reported $ 59,205 and $ 59,893 of these deposits as taxable income for the years 1981 and 1982, respectively. In a statutory notice of deficiency, respondent determined that petitioners had additional taxable income of $ 2,946,930 and $ 123,954 for 1981 and 1982, respectively, for commissions paid by AIBL to Haeri & Associates. Respondent also determined that petitioners had additional taxable income of $ 3,821,642 and $ 720,966 from dividends paid by the Haeri Trust, PDC, and/or various other controlled entities. OPINION Each of the issues to be decided is primarily factual. As to each, petitioners have the burden of proving that respondent's determinations are erroneous. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.
I. Commission Income
A. Individual or Corporate Income
Respondent argues that the fees earned from the AIBL consulting contract were produced by petitioner's professional skill and business reputation and are therefore *40 taxable to petitioner as compensation or business income under section 61. In support of his argument, respondent asserts that Haeri & Associates is a sham corporation. Haeri & Associates was properly organized in accordance with the General Corporation Law of the Republic of Panama, issued stock, elected directors and officers, maintained a bank account, and performed the AIBL consulting contract. Respondent, however, asks us to disregard Haeri & Associates' corporate existence for tax purposes. Generally, a corporate entity will be respected for tax purposes absent "exceptional situations where it otherwise would present an obstacle to the due protection or enforcement of public or private rights." New Colonial Ice Co. v. Helvering,292 U.S. 435, 442 (1934). The test of whether a corporation will be recognized as a taxable entity was stated by the Supreme Court in Moline Properties, Inc. v. Commissioner,319 U.S. 436, 438-439 (1943), as follows: The doctrine of corporate entity fills a useful purpose in business life. Whether the purpose be to gain an advantage under the law of the state of incorporation or to avoid or to comply with the *41 demands of creditors or to serve the creator's personal or undisclosed convenience, so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity. * * * [Fn. refs. omitted.] PDC was a diversified holding company that pursued various business operations in many different countries through numerous subsidiary corporations. Initially, PDC organized Haeri & Associates to provide consulting services to European and American oil companies. Subsequently, PDC and petitioner used Haeri & Associates to provide these services to AIBL. Although petitioner could have provided these consulting services in his individual capacity, petitioner and PDC apparently made a business decision to use Haeri & Associates to perform the contract. Petitioner and PDC organized Haeri & Associates for a business purpose, thus satisfying one of the alternative requirements under Moline Properties v. Commissioner, supra. Haeri & Associates, through the efforts of PDC's Middle Eastern network, actually carried on some minimal amount of business activity. Moreover, Haeri *42 & Associates' identity was recognized by entities not controlled by petitioner, including Ashland and Manufacturers Hanover Bank. These facts lead us to the conclusion that Haeri & Associates was not a sham corporation and that it is to be recognized for tax purposes. Petitioner contends that the consulting fees from AIBL were income to Haeri & Associates, while respondent, relying on the assignment of income doctrine of Lucas v. Earl,281 U.S. 111 (1930), argues that the commissions are taxable to petitioner. The assignment of income doctrine is an essential tool for preventing a taxpayer from assigning income to a corporation to avoid tax liability. A conclusion that Haeri & Associates is not a sham does not preclude application of the assignment of income doctrine; a taxpayer can assign income to a corporation with real and substantial business in an attempt to avoid tax liability. Haag v. Commissioner,88 T.C. 604, 611 (1987), affd. without published opinion 855 F.2d 855 (8th Cir. 1988). The principle that income is taxed to the person who earned it is basic to our system of income tax law. Commissioner v. Culbertson,337 U.S. 733, 739-740 (1949); *43 Lucas v. Earl,281 U.S. at 115. In the corporate context, particularly in those cases involving closely-held or one-person personal service corporations, however, this actual earner test may be inadequate. Johnson v. Commissioner,78 T.C. 882, 890-891 (1982), affd. without published opinion 734 F.2d 20 (9th Cir. 1984). In Johnson, a professional athlete who had conveyed the exclusive rights to his personal services to a corporation contended that the corporation was taxable on amounts paid directly to it by his employer. Recognizing that a corporation can earn income only through the personal services of its employees and agents, we set out two requirements that must be met before a corporation, rather than the service-performing individual, will be considered to control the income earned. As applied in this case, first, Haeri & Associates must have had the right to direct or control petitioner's activities in some meaningful manner. Second, there must have been a contract or similar indication of agreement between Haeri & Associates and AIBL recognizing Haeri & Associates' controlling position. (The Courts of Appeals for the *44 Federal Circuit and for the Seventh Circuit have rejected the two-part Johnson test in favor of a more flexible facts and circumstances approach. See Schuster v. Commissioner,800 F.2d 672 (7th Cir. 1986), affg. 84 T.C. 764 (1985); Fogarty v. Commissioner,780 F.2d 1005 (Fed. Cir. 1986), affg. 6 Cl. Ct. 612 (1984). We need not resolve any conflict between these tests because we would reach the same result applying the facts and circumstances analysis.) In this case, there was a contract between Haeri & Associates and the entity benefiting from petitioner's services, AIBL. Although the record contains no evidence that petitioner had a formal employment contract with Haeri & Associates, there is evidence that PDC, Haeri & Associates' parent corporation, controlled petitioner's efforts to preserve its ongoing relationship with Ashland. Under PDC's direction, petitioner was successful in terminating the consulting agreement between AIBL and Senior Ventures, a PDC subsidiary, and negotiating a new consulting agreement between AIBL and Haeri & Associates, another PDC subsidiary. Respondent relies on two cases in which *45 this Court has upheld reallocations of income under the assignment of income doctrine from a validly organized and operated corporation to its shareholder/employee. See Bagley v. Commissioner,85 T.C. 663 (1985), affd. 806 F.2d 169 (8th Cir. 1986); Askew v. Commissioner,T.C. Memo. 1985-100, affd. 805 F.2d 830 (8th Cir. 1986). Both cases are distinguishable. In Bagley v. Commissioner, supra, the taxpayer received from his employer a $ 50,000 fee in exchange for his agreement to perform consulting services for one year. The consulting fee was reported as income on the income tax returns of a corporation wholly owned by the taxpayer. In the absence of any evidence that the taxpayer was an agent of his wholly-owned corporation at the time he performed the consulting services and received the consulting fee, this Court held that the fee was taxable to the taxpayer individually rather than to his corporation. In Askew v. Commissioner, supra, the taxpayer negotiated a contract for consulting services and subsequently assigned it to his wholly-owned corporation. The agreement was executed *46 by the taxpayer individually, and the corporation did not enter into any agreements with third parties to provide consulting services. In the present case, in contrast, petitioner has shown that AIBL recognized Haeri & Associates as controlling petitioner's performance of consulting services. AIBL contracted with Haeri & Associates for petitioner's consulting services; the agreement and subsequent affidavits, pursuant to which petitioner agreed to perform consulting services, were executed by petitioner in his capacity as president of Haeri & Associates; AIBL's payments, in the form of wire transfers and checks, were to Haeri & Associates and not to petitioner individually; and all payments from AIBL to Haeri & Associates under the consulting agreement were immediately transferred to PDC, the parent corporation. Accordingly, because Haeri & Associates controlled the earning of the income, petitioner is not directly taxable on the income received from AIBL during the years in issue. B. Section 482
If we conclude that the commission payments from AIBL were income to Haeri & Associates and not to petitioner individually, respondent argues that this income may be properly *47 allocated to petitioner pursuant to section 482. [3] Section 482 allows the Commissioner to reallocate income actually earned by one member of a controlled group to other members of that group if (1) there are two or more trades, businesses, or organizations, (2) the enterprises are owned or controlled by the same interests, and (3) reallocation of income among the enterprises is necessary to clearly reflect income or to prevent the evasion of taxes. Wilson v. United States,530 F.2d 772, 777 (8th Cir. 1976). *48 In section 482, Congress provided a mechanism for allocating income among related taxpayers. One of the reasons for enacting section 482 was to prevent the evasion of taxes by shifting income from a domestic business to a foreign corporation controlled by the same interests. Hospital Corp. of America v. Commissioner,81 T.C. 520, 593 (1983). The regulations state that "The purpose of section 482 is to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer, by determining, according to the standard of an uncontrolled taxpayer, the true taxable income from the property and business of a controlled taxpayer." Sec. 1.482-1(b)(1), Income Tax Regs.; Hospital Corp. of America v. Commissioner,81 T.C. at 593. The standard to be applied in examining dealings between controlled taxpayers is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer. Sec. 1.482-1(b)(1), Income Tax Regs. The regulations also provide that "Transactions between one controlled taxpayer and another will be subjected to special scrutiny to ascertain whether the common control is being used to reduce, avoid, or escape taxes. *49 " Sec. 1.482-1(c), Income Tax Regs.
Petitioner's furnishing of consulting services on behalf of Haeri & Associates to AIBL constituted a trade or business separate from PDC for purposes of section 482. See Haag v. Commissioner,88 T.C. at 614-615. [4] Similarly, petitioner and Haeri & Associates were controlled by the same interests. Section 1.482-1(a)(3), Income Tax Regs., provides that the control may be direct or indirect, whether legally enforceable and however exercisable or exercised. Petitioner testified before the SEC in 1983 that Haeri & Associates was "basically a company that I control." *50 Section 482, however, does not permit allocation of income merely because the common interests have the power to shift income. A reallocation under section 482 must be based on actual shifting of income. Hospital Corp. of America v. Commissioner,81 T.C. at 594. We must, therefore, examine all of the facts and circumstances to determine whether there has been a shifting of income between Haeri & Associates and petitioner. Respondent's section 482 allocation will be sustained unless petitioner establishes that it is arbitrary, capricious, and unreasonable. Haag v. Commissioner,88 T.C. at 614; Hospital Corp. of America v. Commissioner,81 T.C. at 594. Respondent allocated all of Haeri & Associates' gross income to petitioner. The issue under section 482 is whether Haeri & Associates and petitioner would have entered into their financial relationship had they been unrelated parties dealing at arm's length. Respondent cites Keller v. Commissioner,77 T.C. 1014, 1025 (1981), affd. 723 F.2d 58 (10th Cir. 1983), where this Court suggested that a section 482 reallocation would be appropriate where *51 the taxpayer was not adequately compensated by his wholly-owned corporation. In Keller we inquired whether the total compensation that was paid to the taxpayer after the incorporation of his wholly-owned corporation was essentially equivalent to that which he received in the pre-incorporation years. On that basis, we found the taxpayer's compensation equivalent to that which he would have bargained for in an arm's-length transaction with an unrelated party, and thus no basis for reallocation. Respondent argues that petitioner would not have agreed to work for no compensation if he had bargained at arm's length with an uncontrolled entity. Although a corporation is not required to pay a salary to an officer who performs services on its behalf, particular scrutiny is necessary when the corporation's only business activity is transacted solely through the efforts of the individual as an employee of that corporation. Keller v. Commissioner,77 T.C. at 1025-1026. Petitioner, who had withdrawn from active business dealings, argues than he intervened in the AIBL transaction on behalf of his corporation, PDC, as an investor not as an employee of Haeri & Associates. *52 Further, petitioner contends that his expected financial return for his time and effort was "income, profit or gain in the form of dividends or enhancement in the value of an investment." Whipple v. Commissioner,373 U.S. 193, 202 (1963). These very assertions, however, preclude our determining that the arrangement would have been entered into by an unrelated party dealing at arm's length. The commission income paid to Haeri & Associates may have been compensation in part for items other than petitioner's services. It was petitioners' burden, however, to present evidence sufficient to establish a more correct allocation and to persuade us that respondent's allocation was arbitrary, capricious, and unreasonable. They have not done so. II. Distributions by Controlled Entities
As previously noted, the parties have stipulated that $ 2,926,345 and $ 871,500 were deposited in petitioners' bank accounts during 1981 and 1982, respectively. Of these amounts, petitioners reported $ 59,205 and $ 59,893 as taxable income for 1981 and 1982. Bank deposits are prima facie evidence of income. Estate of Mason v. Commissioner,64 T.C. 651, 656-657 (1975), *53 affd. 566 F.2d 2 (6th Cir. 1977); Tokarski v. Commissioner,87 T.C. 74, 77 (1986). Petitioners argue that funds received from the Haeri Trust were used principally to further charitable activities, and that consequently, they should be taxed only on those funds which they used for their personal living expenses. Petitioners presented no evidence to support their contention. To the contrary, petitioners had complete discretion over the funds deposited to bank accounts over which they had control. Respondent proposes several alternative arguments supporting his determination that petitioners are taxable on income they received during the years in issue. We agree with respondent that the Haeri Trust falls within the grantor trust provisions of sections 671 through 679. We, therefore, do not reach respondent's other contentions. A grantor of a trust who retains certain powers that may be exercised without the approval or consent of an adverse party is treated as the owner of the trust and taxed individually. The term "adverse party" is defined in section 672(a) as "any person having a substantial beneficial interest in the trust which would be adversely *54 affected by the exercise or nonexercise of the power which he possesses respecting the trust." Section 679 specifically applies to foreign trusts having United States beneficiaries and provides that a United States person who transfers, directly or indirectly, property to a foreign trust shall be treated as the owner of the trust if there is a United States beneficiary. A United States person includes a citizen or resident of the United States. Section 7701(a)(30). Petitioner was a resident alien of the United States at the time the Haeri Trust was established. Although the trust indenture identifies Jafar as settlor, Jafar was acting as the agent of petitioner when he conveyed income-producing property to the trust for the benefit of petitioner, the sole trust beneficiary. Moreover, none of the trustees was an adverse party within the meaning of section 672(a). A trustee is not an adverse party merely because of his interest as trustee. Sec. 1.672(a)-1, Income Tax Regs. All of the trustees of the Haeri Trust were business associates or friends of the beneficiary. Under comparable circumstances, this Court has found that no adverse party existed. Bixby v. Commissioner,58 T.C. 757, 790 (1972). *55 This Court has consistently held that family trusts do not shield taxpayers from tax on income that is otherwise taxable to them. See Schulz v. Commissioner,686 F.2d 490 (7th Cir. 1982), affg. T.C. Memo. 1980-568; Vnuk v. Commissioner,621 F.2d 1318 (8th Cir. 1980), affg. T.C. Memo. 1979-164; Markosian v. Commissioner,73 T.C. 1235 (1980); Wesenberg v. Commissioner,69 T.C. 1005 (1978). Petitioners are taxable on the trust income under section 671. III. Additions to Tax
A. Section 6653(a)
Section 6653(a)(1) imposes a five percent addition to tax on any underpayment of tax due to negligence or intentional disregard of rules and regulations. Additionally, section 6653(a)(2) provides for an addition to tax in an amount equal to 50 percent of the interest due on that portion of the underpayment attributable to negligence or intentional disregard of rules and regulations. Negligence is defined as the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner,85 T.C. 934, 947 (1985). *56 The addition to tax for negligence is generally not imposed where a taxpayer's failure to report income is in good faith and based on advice of a competent tax expert. Otis v. Commissioner,73 T.C. 671, 675 (1980); Industrial Valley Bank & Trust Co. v. Commissioner,66 T.C. 272 (1976); Conlorez Corp. v. Commissioner,51 T.C. 467, 475 (1968). Respondent relies on Hanson v. Commissioner,696 F.2d 1232 (9th Cir. 1983), and Whyte v. Commissioner,T.C. Memo. 1986-486, affd. 852 F.2d 306 (7th Cir. 1988), to support the imposition of the negligence addition. These cases are distinguishable. In Hanson v. Commissioner,696 F.2d at 1234, the Court of Appeals for the Ninth Circuit affirmed the imposition of the addition to tax for negligence, noting that the Tax Court found as a matter of fact that the taxpayers did not rely on an attorney or accountant in establishing a "flagrant tax avoidance scheme repeatedly rejected by the courts." In Whyte, we sustained an addition to tax for fraud against the taxpayer even though he relied on his accountant to prepare his tax returns. *57 The taxpayer in Whyte, unlike petitioners herein, failed to supply his accountant with necessary tax return information and concealed from his accountant large amounts of income. In the instant case, petitioners relied on an experienced accountant to complete their income tax returns for the years in issue. Petitioners kept records of the funds deposited into their bank accounts, and provided this information to their accountant. They kept records of their financial activities, and did not hide this information from their accountant. We have sustained respondent's section 482 allocation because of petitioners' failure of proof at trial and not on the basis of clear evidence of unreported income. Based on the particular circumstances herein, we hold that petitioners are not liable for an addition to tax under section 6653(a). B. Section 6661(a)
With respect to returns filed after December 31, 1982, section 6661(a) imposes an addition to tax on any underpayment attributable to a substantial understatement of income tax. Section 6661(b)(1) defines a substantial understatement of income tax as an understatement exceeding the greater of 10 percent of the tax required *58 to be shown on the return for the year or $ 5,000. The amount of the understatement is to be reduced in accordance with the provisions of section 6661(b)(2)(B) and (in cases involving tax shelters) (C). [5] After respondent sent the notice of deficiency involved in this case, the rate of the addition to tax under section 6661(a) was increased from 10 to 25 percent. See Pallottini v. Commissioner,90 T.C. 498 (1988). Because respondent has not made claim for the increased amount, any addition to tax due from petitioners under section 6661 is limited to 10 percent of the underpayment. Smith v. Commissioner,91 T.C. 733 (1988). *59 Petitioners substantially underreported taxable income on their 1982 tax return. They have not shown that they satisfied any of the exceptions under section 6661(b)(2)(B). We, therefore, sustain respondent's determination with respect to the addition to tax under section 6661(a). To reflect the foregoing and other issues settled by the parties, Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code as amended and in effect during the years in issue, except as otherwise noted. * 50 percent of the interest due on $ 4,617,846. ** 50 percent of the interest due on $ 424,230.↩
2. Petitioners claimed at trial that deposits of $ 400,000 and $ 100,000 made during 1981 were transfers of funds from previously purchased certificates of deposits. Petitioners were given the opportunity to move to reopen the record for evidence to that effect within thirty days of the conclusion of the trial. Petitioners have failed to do so. Petitioners also failed to file a reply brief as directed by the Court. Subsequent to trial, respondent conceded a $ 1,000,000 credit to a Lazard Brothers Company Ltd. account for petitioner as nominee of PDC was not includable in petitioners' income in 1981.↩
3. SEC. 482. ALLOCATION OF INCOME AND DEDUCTIONS AMONG TAXPAYERS. In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.↩
4. In Foglesong v. Commissioner,621 F.2d 865 (7th Cir. 1980), revg. and remanding a Memorandum Opinion of this Court, on remand 77 T.C. 1102 (1981), revd. 691 F.2d 848 (7th Cir. 1982), the Court of Appeals for the Seventh Circuit held that a sec. 482 allocation of income from a one-man personal service corporation to the shareholder-employer was improper because the taxpayer as an employee could not be considered a separate trade or business. The instant case does not involve allocations of income from a personal service corporation to the sole shareholder-employer. Accordingly, Foglesong↩ is not on point and does not control disposition of the issues herein.
5. Section 6661 (b)(2)(B) provides: (B) Reduction for understatement due to position of taxpayer or disclosed item. -- The amount of the understatement under subparagraph (A) shall be reduced by that portion of the understatement which is attributable to -- (i) the tax treatment of any item by the taxpayer if there is or was substantial authority for such treatment, or (ii) any item with respect to which the relevant facts affecting the item's tax treatment are adequately disclosed in the return or in a statement attached to the return.↩